RICHARD ALAN LONG, Plaintiff-Appellee, *v.* DUGGAN-KARASIK CONSTRUCTION COMPANY, Defendant-Appellant—(CECO CORPORATION, Defendant-Appellee).

(No. 58018;

First District (1st Division)—October 21, 1974.

*Rehearing denied November 26, 1974.*

Nolan, O'Malley & Dunne, of Chicago (Patrick W. Dunne, of counsel), for appellant.

Horwitz, Anesi, Ozmon & Associates, Ltd., of Chicago (Nat P. Ozmon and Dario A. Garibaldi, of counsel), for plaintiff-appellee.

McKenna, Storer, Rowe, White & Haskell, of Chicago (John C. Bartler and Robert S. Soderstrom, of counsel), for defendant-appellee.

Mr. JUSTICE BURKE delivered the opinion of the court:

This is an action seeking damages because of personal injuries suffered by Richard Alan Long against Duggan-Karasik Construction Company (hereinafter "Duggan-Karasik") under the Structural Work Act (Ill. Rev. Stat. 1971, ch. 48; par. 60 *et seq.*) and against Ceco Corporation (hereinafter "Ceco") on the theory of products liability. Prior to the trial, the court struck a counterclaim of Duggan-Karasik against Ceco based upon the theory of active-passive negligence. The case proceeded to trial and at the close of all the evidence, the court directed the jury to find that Duggan-Karasik was "in charge of" the work and that the device upon which plaintiff was working at the time he was injured was a scaffold. The court also instructed the jury that plaintiff was entitled to recover damages as a matter of law against one or both of the defendants. The jury returned a verdict in the amount of $175,000 in favor of plaintiff and against Duggan-Karasik. The jury also returned a verdict of not guilty in favor of Ceco. Duggan-Karasik appeals.

On May 13, 1965, plaintiff was injured while engaged as an employee in the construction of an addition to the West Chicago High School. He was standing on a longspan bar joist which fell. This longspan bar joist was designed and installed to support the roof of the gymnasium addition to the school. At the time of the occurrence, the plaintiff was employed by Commercial Steel Supply Company (hereinafter "Commercial"). Plaintiff filed a complaint against the Board of Education (hereinafter the "Board"), the owner of the property; Duggan-Karasik, the general contractor; Bergen, Kelly, Unteed and Associates (hereinafter "Bergen"), the architects; and Ceco, the manufacturer and supplier of the longspan bar joist. Plaintiff's complaint insofar as defendants, the Board, Duggan-Karasik and Bergen, was for injuries to the plaintiff because of alleged violations of the Structural Work Act of the State of Illinois. Plaintiff's complaint against Ceco alleged that this defendant had manufactured and supplied a defective product.

Thereafter, the Board and Duggan-Karasik filed a third-party complaint against Commercial, plaintiff's employer. This third-party com-

plaint contended that Commercial by contract indemnified the Board and Duggan-Karasik for all injuries arising out of the execution of its work. Third-party plaintiffs, the Board and Duggan-Karasik, thereafter made a motion for judgment on the pleadings against Commercial insofar as the third-party actions were concerned and on December 17, 1969, the court entered an order granting the motions for judgment on the pleadings against Commercial. On October 8, 1971, a motion was made to substitute attorneys for Duggan-Karasik and the Board and to dismiss the third-party complaints of the Board and Duggan-Karasik against Commercial, and the court entered an order accordingly. Thereupon Duggan-Karasik and the Board filed a counterclaim against Ceco alleging that the Board and Duggan-Karasik, if liable at all in this cause, could only be passively liable and that Ceco was actively liable.

On January 6, 1972, Ceco filed a motion to dismiss the counterclaim against it of Duggan-Karasik and the Board. The primary basis for this motion was the contention that Commercial had taken over the defense of Duggan-Karasik and the Board, and under such circumstances section 22(3) of the Civil Practice Act (Ill. Rev. Stat. 1973, ch. 110, par. 22(3)) required that any complaint brought by Duggan-Karasik and the Board against Ceco show on its face that the complaint was for the benefit of Commercial. Thereafter, Ceco filed a counterclaim against Commercial. The court granted Ceco's motion to dismiss, holding that any complaint of Duggan-Karasik must show on its face that it was for the use and benefit of Commercial. Duggan-Karasik was given the opportunity to file an amended counterclaim against Ceco provided that the amended counterclaim reflect on its face that it was for the use and benefit of Commercial. Duggan-Karasik refused to take this action. Thereupon a motion was filed in behalf of Commercial to strike the counterclaim of Ceco, which the court denied. At this juncture the court granted the motion of Duggan-Karasik to sever all third-party actions.

Prior to the trial plaintiff dismissed Bergen and the Board from the case.

Donald Lee Hurst, an iron-worker employee of Commercial, was called as a witness in plaintiff's behalf. Mr. Hurst had been a certified welder for 7 years and had worked on the West Chicago High School gymnasium addition for Commercial. He testified that the general contractor on this job was Duggan-Karasik and that Duggan-Karasik was represented on the job by a general superintendent named Ken Munson. In April of 1965, Mr. Hurst as foreman, with other employees of Commercial, began to install the supports for the roof area of the gymnasium. These supports consisted of longspan bar joists, which were approximately 115 to 120

feet in length and each weighed about 8000 lbs. At the time of installation Ken Munson, the general superintendent of Duggan-Karasik, was on the job daily and coordinated variations of work.

When the longspan bar joists were brought to the construction site, the truck driver would go through the Duggan-Karasik work area. Mr. Hurst testified that the longspan would be laid down at "proper spacing" and that the setting would be checked or inspected by Ken Munson, the general superintendent of Duggan-Karasik.

Mr. Hurst testified that all of the longspans had been permanently installed in April 1965. He further testified that there was an architectural representative on the job named Fritcher or Jim Bell, who inspected the erection of the steel joists.

Mr. Hurst further testified that the iron workers walked across the top of the longspan bar joist at the time they were doing their work and that this was the method utilized to get from one place to another. He testified that the joists were used for support.

Mr. Hurst categorized the function of Ken Munson, Duggan-Karasik's superintendent, as that of "watching what was going on" while the longspan bar joists were being set. After the first bar joist was installed, guy wires were attached. In the installation of the first or southernmost longspan bar joist, initially it was installed 1 foot off on one side. When this error was discovered, the welds on the one side were burnt off and a longspan joist was moved 1 foot and rewelded.

The installation of the longspan bar joists was completed in April 1965 and the entire Commercial crew left the job for 2 or 3 weeks. This crew returned to the job on May 13, 1965, the day of the occurrence. The Commercial crew on the day of this occurrence was composed of Mr. Hurst who was the foreman, the plaintiff Long and another iron worker named Clifford Landry. Mr. Hurst testified that upon returning to the scene of the occurrence on May 13, 1965, at about 2 P.M., there was a conversation with Ken Munson, the superintendent of Duggan-Karasik, and Bill Holman, the foreman of the Commercial crew, about moving the southernmost longspan bar joist to the north. This conversation took place at the Duggan-Karasik shack on the job site where the architectural prints were kept. Mr. Hurst further testified that he was present at another conversation between Ken Munson of Duggan-Karasik, Bob Lewis and Dale Washburn, at which they discussed another method of getting the short bar joists out of the gymnasium. This conversation took place about the middle of April and concerned the use of a cinder athletic track for Commercial's vehicles. Mr. Munson refused to permit the Commercial crew to use the athletic track.

After the conversation with Mr. Munson on May 13, 1965, Mr. Hurst

and the plaintiff received orders from Bill Holman, the Commercial foreman, to start preparing the southernmost longspan bar joist for moving. Mr. Hurst and the plaintiff went up the east wall of the gymnasium and got up on the longspan bar joist. Mr. Hurst testified that thereupon he and plaintiff removed the bridging between the southernmost bar joist and the number two bar joist. Mr. Hurst then removed or loosened one of the guy wires in preparation for moving the longspan. Thereafter, Mr. Hurst moved off of the longspan and down the wall in order to obtain a welding torch which was on the ground level. Mr. Hurst testified that at this time Commercial had a crane in the gymnasium but that the crane was not being utilized at this point. Mr. Hurst testified that he next recalled hearing a loud crack and seeing the southernmost longspan bar joist on the ground below. He did not see the longspan bar joist fall down but he did see the plaintiff in the air. The witness further testified that Bill Holman, the Commercial foreman, immediately upon seeing what had happened, hollered and Ken Munson of Duggan-Karasik, who was in the door of the job shack, called an ambulance. Mr. Hurst saw Mr. Munson there immediately after this occurrence took place. Mr. Hurst further testified that he took his orders from Bill Holman, the Commercial foreman.

Mr. Hurst further testified that when his crew left the site in April, they had four cables attached to the truss. At the time of the occurrence, the cable about 20 feet from the west end had been removed. There was a cable about 20 feet from the east end and two in the center. The middle cable running to the south had been loosened from its taut position. Mr. Hurst testified that neither he nor anyone in his iron working crew had loosened that cable; that the Commercial crew found the cable loose when they came back and were out on the job site.

Mr. Hurst further testified that it was the responsibility of Ken Munson, the general job superintendent, for the prevention of accidents. He testified that during the discussion that was held in the trailer immediately prior to moving the beam, it was Ken Munson's decision to move the beams over the wall. Mr. Hurst testified that there were alternate methods of moving the longspan beams and that one of the methods involved the use of the athletic track. The witness further testified that Mr. Holman, the Commercial foreman, preferred to use the planking method used on the athletic track in order to move the longspan joists. Mr. Hurst further testified that Mr. Munson of Duggan-Karasik preferred moving the longspan joist and directed that the project be done in this manner.

Mr. Hurst further testified that it was customary for the supervision of the foreman of the subcontractors to come from the superintendent or

his equivalent with the contractor and that this custom was adhered to on this particular job.

Mr. William H. Holman was called as a witness and testified on plaintiff's behalf. On the day of the occurrence Mr. Holman was the foreman of the Commercial crew. He had four iron workers in his crew, plus one crane operator. He testified that when he arrived on the construction site on the date of the accident, he had a conversation with Ken Munson, the general superintendent of Duggan-Karasik. Mr. Holman testified that Ken Munson "jumped me when we first got on the job about being late and wanted us to get going and get the trusses moved so we can get our bar joists up in place." After this conversation Mr. Holman proceeded to start to work. He had his crew go up and start disconnecting the bridging. The longspan bar joist which was to be moved was the southernmost joist. As the work began Mr. Holman observed that the four guy wires were attached to the longspan joist but that one of them had been loosened. Mr. Holman and his crew were there in order to move the southernmost bar joist in order to make room to get certain other steel out of the gymnasium. As foreman, Mr. Holman did not request that the crane be hooked up to the joist at any time before the occurrence. Mr. Holman further testified that in order for his crew to move from one place to another to do their work, it was necessary for them to walk on the trusses and the structural steel. He further testified that he and the rest of his crew walked on the bar joists and that to his knowledge there was no other scaffolding on this job relating to the iron workers.

After Mr. Holman instructed the Commercial iron worker to get the torch, one of the iron workers came down from the longspan bar joist. Plaintiff Long remained on the longspan bar joist and all of a sudden Mr. Holman saw the longspan bar joist roll over and drop into the hole and he saw the plaintiff fall. Mr. Holman did not know whether Mr. Munson of Duggan-Karasik was in the near vicinity or within the view of the operation of removing the longspan bar joists when plaintiff fell. Mr. Holman did testify that Ken Munson had been on the job site all afternoon on the date of the occurrence.

Mr. Holman further testified that as foreman of the Commercial crew on this job he had "running contact through the day every day" with Ken Munson, the general superintendent of the general contractor, Duggan-Karasik. Mr. Holman testified that the purpose of this contact was to "get okays or rejections of things" which they had to do. He further testified that the decisions relative to the scheduling of this job were made by Ken Munson of Duggan-Karasik and that Mr. Munson as superintendent made inspections on a regular basis of the work done under various foremen of the general subcontractors. There were conferences

or decisions to be made relative to interpretations of the specifications or the plans on the job and the final decision was always made by the superintendent, Ken Munson. Mr. Holman further testified that as a foreman he had received direct orders as to things which he could do or could not do from the general superintendent of Duggan-Karasik, Mr. Munson. Mr. Holman further testified that his superior on the job would be the general superintendent of Duggan-Karasik. Mr. Holman testified that prior to moving the shortspan joists out of the gymnasium, Mr. Munson told him "what he wanted done."

Mr. Holman testified that he was the head man on the job for Commercial on the day of the mishap and that as such he was responsible for his men and their safety.

Herman Clark, a crane operator employed by Commercial, was called as a witness by plaintiff. Mr. Clark testified that when he came to the job site prior to the installation of the longspan bar joists, he saw Mr. Kenneth Munson of Duggan-Karasik. Mr. Clark stated that there was a problem at the job site because of the mud in the area and he asked Ken Munson of Duggan-Karasik how to get his crane into the gymnasium area. Mr. Munson showed Clark how to get his crane into the gymnasium area. Mr. Clark testified that there were 15 longspan bar joists put in during the initial operation and that this operation took approximately three weeks. Mr. Clark testified that during this 3-week period, he had occasion to see Mr. Munson, the general superintendent of Duggan-Karasik, every day and that he had numerous conversations with Mr. Munson. Mr. Clark stated that he received a couple of orders directly from Mr. Munson of Duggan-Karasik. Mr. Clark remembered twice asking Mr. Munson if they could use the tracks to drive along side the building in order to get out of the mud and Mr. Munson told them that they could not use the tracks. Mr. Munson further gave Mr. Clark orders to move some pipe for the plumbers. Mr. Clark also heard Mr. Munson give orders to Mr. Clark's foreman, Bobby Lewis, on two occasions. These orders consisted of directions to stay off the track and to unload steel in a certain place. Mr. Clark also heard Mr. Munson give two orders to Mr. Holman of Commercial. The orders given to Holman were to stay off the track and to move bar joists back. Mr. Clark further testified that Mr. Munson was the only person that he could identify from Duggan-Karasik on this job site.

Mr. Clark testified that on the afternoon of the occurrence, he arrived on the job site about 2 P.M. or 2:30 P.M. He saw Mr. Munson, the general superintendent of Duggan-Karasik. Mr. Clark testified that the Commercial crew were waiting for the instructions on how the general contractor wanted the bar joists moved. Mr. Clark testified that he

was present at a conversation between Ken Munson of Duggan-Karasik and Mr. Holman of Commercial during which Ken Munson, the general superintendent of Duggan-Karasik, stated, "It's about time you guys got here. You were supposed to be here this morning. Let's get the damn trusses moved back so we can get these other bar joists over the wall." Mr. Clark further stated that Ken Munson said, "This is the only way to do it, you can't go on the track."

After this conversation, Mr. Clark stated that the iron workers started working. Don Hurst and plaintiff Long climbed up the wall and climbed to the top of the first truss. They began to undo the bridging. The next thing Mr. Clark observed was a crash and the joist came down. Mr. Clark saw the longspan bar joist roll to the south immediately prior to its falling.

Plaintiff offered and the court received in evidence over the objection of Duggan-Karasik, plaintiff's Exhibit No. 24, which consisted of certain excerpts of the general conditions of the contract between the Board as "Owner" and defendant Duggan-Karasik as "Contractor" as follows:

"GENERAL CONDITIONS OF THE CONTRACT

1. DEFINITIONS.

"The Contract Documents consist of the Agreement, the General Conditions of the Contract, the Supplementary General Conditions, the Drawings, and the Specifications, including all modifications thereof incorporated in the Documents before their execution. These form the Contract.

The Owner, the Contractor, and the Architect are those mentioned as such in the agreement. They are treated through out the Contract Documents as if each were of the Singular number and masculine gender.

The term sub-contractor includes all persons and parties defined as a sub-contractor in Section 21 of the Mechanics Lien Act of the State of Illinois.

17. SAFETY PROVISIONS

The Contractor shall take all necessary precautions for the safety of employees on the work, and shall comply with all applicable provisions of Federal, State and Municipal safety laws and Building codes to prevent accidents or injury to persons on, about, or adjacent to the premises where the work is being performed.

The Contractor shall in connection with his work, determine the need for, erect and properly maintain at all times, as required by the conditions and progress of the work, passage

ways, guard fences, barricades, lights, danger signs warning against hazards and all other necessary safeguards for the protection of workmen and the public.

The Contractor shall design (except where design is definitely shown or specified), construct and maintain in a manner to assure their ample safety under the loadings actually imposed on them the following: forms for concrete, staging, scaffolds, needling, shoring, temporary bracing and other temporary construction, ladder, ditches, and mechanical construction apparatus.

The Contractor shall designate a responsible member of his organization on the work, whose duty shall be the prevention of accidents. In an emergency affecting the safety of life or of the work or of adjacent property, the Contractor without special instructions from the Architect or Owner, shall act to prevent such threatened loss or injury.

20. CONTRACTOR'S INSPECTION

The Contractor shall duly inspect all materials as delivered on the premises and reject defective materials without waiting for the Architect to observe the materials. The Contractor shall duly inspect all construction as it is built in place without waiting for the Architect to observe the construction and shall report all deficiencies to the Architect. He shall, to the above ends, thoroughly familiarize himself with the Drawings and Specifications.

21. SUPERINTENDENCE-SUPERVISION

The Contractor shall keep on his work during its progress a competent, full time superintendent qualified to carry out the work in accordance with the Contract Documents and to co-ordinate the various phases of the work so as to avoid unnecessary delays, errors or omissions.

Such superintendent and necessary assistants, shall be satisfactory to the Architect. The Superintendent shall not be changed except with the consent of the Architect, unless the Superintendent proves to be unsatisfactory to the Contractor and ceases to be in his employ. The Superintendent shall represent the Contractor in his absence, and all directions given him shall be as binding as if given to the Contractor.

On written request, such directions shall be confirmed in writing to the Contractor. The Contractor shall efficiently supervise and direct his work, including the work of all subcontractors, using his best skill and attention. He shall carefully study and

compare all Drawings, Specifications and other instructions and shall at once report to the Architect any error, inconsistency or omission which he may discover.

36. COORDINATION OF WORK

If any part of the Contractor's or any of his sub-contractors work depends for proper execution or results upon the work of any contractor or sub-contractor other than himself, the Contractor or such sub-contractor shall inspect and promptly report to the Architect any defects in such work that render it unsuitable for such proper execution and results. Failure to inspect and report shall constitute an acceptance of the other contractor's or subcontractor's work, as fit and proper for the reception of his work, except as to defects which may develop in the other contractor's or subcontractor's work after execution of the work.

37. SUB-CONTRACTORS

The Contractor agrees that he is as fully responsible to the Owner for the supervision and direction of the work of and for the acts and omissions of his sub-contractors and of persons either directly or indirectly employed by them as he is for the supervision and direction of the work of and for the acts and omissions of persons directly employed by him.

57. STANDARD SPECIFICATIONS, CODES

All work so specified or to which they are applicable shall comply with the named standard specifications or codes.

Reference to standard specifications and codes refer to editions in effect at time or proposal, and include current addenda, if any.

Abbreviations identifying standard specifications and codes are used in these Specifications as follows:

ASTH.......... American Society for Testing Materials.
Fed. Spec....... Federal Specifications.
ACI............ American Concrete Institute.
AISC........... American Institute of Steel Construction.
NAANM....... National Assoc. of Architectural Metal Mfgrs.
Highway Speci-
    fications...... Standard Specifications for Road and Bridge Construction, Div. of Highways, State of Ill.
SJI............. Steel Joist Institute.
NEC........... National Electric Code.
NBFU......... National Bureau of Fire Underwriters.
AGA.......... American Gas Association.

Addition and Remodeling
West Chicago High School
SUPPLEMENTARY GENERAL CONDITIONS

4. TEMPORARY OFFICE

The General Contractor shall provide, maintain, and remove when directed, on the premises a suitable temporary building for use as an office.

8. CARE OF PREMISES

The General Contractor shall be in general charge of the premises subject only to the rights of the Owner, the Architect, and other Contractors. He shall have authority to keep all persons not directly interested, off the premises. He shall keep the building closed and locked after it is under roof and until it is accepted by the Owner.

Plaintiff was called as a witness and testified that in May, 1965, he was employed as an apprentice iron worker by Commercial. He testified that on the day of the occurrence, he and his crew arrived at the West Chicago High School at about 2:30 P.M. and that while on the job site, he had occasion to be walking across the top of the longspan bar joist. Plaintiff testified that he walked across the longspan bar joist three or four times prior to the accident. Immediately prior to the occurrence, he was standing on the longspan bar joist 30 feet from the west end when the bar joist rolled and he was falling feet first in mid-air. The next thing plaintiff remembered was lying on the ground.

Mr. Floyd Hupp, called by plaintiff, testified that he was employed as a bricklayer foreman on the West Chicago High School project. He testified that Ken Munson, the superintendent of Duggan-Karasik, coordinated the efforts of the subcontractors and if a decision had to be made, he would go to Mr. Munson. Mr. Hupp further testified that Ken Munson, besides handling the timing of work, oversaw the whole job.

Mr. Robert Duggan, President of Duggan-Karasik, testified on behalf of that company that Duggan-Karasik had a contract for the construction of the West Chicago High School gymnasium and that he had a general superintendent on the job site named Ken Munson. Mr. Duggan, after examining plaintiff's exhibit No. 24, stated that Duggan-Karasik had the responsibility to supervise their subcontractors and that one of their subcontractors was Commercial.

Mr. Kenneth Munson was called as a witness and testified on behalf of defendant, Duggan-Karasik, that he was the superintendent for Duggan-Karasik on the construction of the gymnasium addition of the West Chicago High School. He further testified that Duggan-Karasik was the general contractor but that all the work they did was strictly con-

crete work and carpentry work and that all of the rest of the work was sublet. Mr. Munson stated that as superintendent of Duggan-Karasik, his duties involved overseeing and scheduling the subcontractors' work which had to be done on the project. Mr. Munson stated that he d'd not remember whether or not he told any Commercial employee how to do his job. Mr. Munson stated that he had an obligation to coordinate and set up the time sequence of work. Mr. Munson would check the work to be sure that a certain minimum work was 'done daily. He further testified that if he saw something wrong with the work of a subcontractor, he might suggest a correction. Mr. Munson was on the job site when the longspan bar joist fell and plaint'ff was injured. He observed the Commercial iron workers going about their work in preparation for the removal of the bar joist, and said that he had been in on conferences relative to the reason why the longspan bar joist had to be removed. Mr. Munson stated that he called Commercial to come in and finish their work. Mr. Munson stated that he saw the iron workers from Commercial going about their work and that he was aware that the iron workers walked and used the tops of the longspan bar joists for their support and access to their work.

Mr. Munson further testified that he was aware of the characteristic of longspan bar joists to bow. He further testified that he was aware that the standards in the industry required bridging to be installed before the hoist or lifting lines were removed.

Mr. Munson stated that some time prior to the mishap he saw plaintiff up on top of the bar joist. He stated that it could have been 5 minutes, 2 minutes or 1 minute prior to the occurrence. Mr. Munson further stated that in a prior statement he had said that he was right there when the bar joist fell. Mr. Munson also testified that at the time he saw these various processes going on by the iron workers, he knew that this bar joist was about to be removed. He testified that he did not remember whether the crane was attached to the bar joist at this time. He stated that his memory would have been better in 1967, when he gave a deposition and at that time stated that the hoist was not connected to the longspan bar joist at the time the iron workers were in the process of moving the joist. Mr. Munson further testified that on the day of the occurrence, he used the bar joist himself as a means of support to walk from one place to another.

Mr. Wayne Fritch was called as a witness by defendant Ceco. Mr. Fritch testified that he was chief of the Palatine office of Unteed and Associates, the architects for the addition to the West Chicago High School. Mr. Fritch stated that he learned of plaintiff's mishap through a

telephone call on May 13, 1965, and that he immediately went to the site. When he arrived at the construction site, he found the southernmost bar joist had fallen off the wall and he noticed a broken cable over the south wall and no bridging attached to the joist that fell. Mr. Fritch testified that the American Institute of Steel Construction required bridging or temporary cabling of joists as soon as they are erected to give the joists stability. The witness further stated that good construction practices required that the crane be used with this longspan joist.

Mr. Howard H. Novell was called as a witness by Ceco. Mr. Novell stated that just prior to the occurrence he had walked across the bar joist which fell.

Mr. Howard Sporleder was called as a witness and testified on behalf of defendant Ceco. Mr. Sporleder was district engineer for the Chicago office of Ceco and testified that he went to the scene of the occurrence on May 14, 1965. He stated that he had a conversation with Ken Munson, the superintendent of Duggan-Karasik, and asked Mr. Munson what brought the truss down. According to Mr. Sporleder, Mr. Munson indicated that there was a problem moving certain steel inside the gymnasium and in order to do this, the southernmost longspan bar joist had to be moved; that the bar joist was being moved at the time of the accident and that there had been three cables attached to the longspan, one to the north and two to the south, and one of the cables going to the south had been removed and the joist fell. Mr. Sporleder observed that the bridging to the southernmost bar joist had been removed. The purpose of bridging, according to Mr. Sporleder, was to give lateral support, and he stated that bridging should be installed before the crane is released. He further gave his opinion that the fall of the longspan bar joist was caused by improper use of guy wires. The witness testified that Mr. Munson stated to him in substance that he was aware of the guying method that was being used as the iron workers attempted to remove the number one bar joist. The witness further testified that Mr. Munson was aware of the entire operation which was being performed, and he knew the number of guy lines that were being used. Mr. Sporleder further testified that during his conversation with Mr. Munson, Mr. Munson indicated that the occurence took place at a time when the crane had not been attached to the bar joist plaintiff was working on.

Ken P. Milbradt, a professor of civil engineering from Illinois Institute of Technology, was called as a witness and testified on behalf of Ceco. Professor Milbradt, based upon a hypothetical question, stated that it was his opinion that the cause of the fall of the longspan bar joist was pressure on the guy line or cable going to the north. The witness further

testified that the standards of the industry required bridging to be put in before the hoisting cable is released.

During the course of the trial, other witnesses were called and additional evidence was adduced concerning the alleged liability of defendant Ceco. At the conclusion of the trial, however, the jury found defendant Ceco not guilty. Plaint'ff has not appealed with respect to the judgment concerning Ceco's liability and therefore it is not necessary to review in detail the evidence relating to Ceco.

■■ Defendant Duggan-Karasik argues that the Civil Practice Act (Ill. Rev. Stat. 1973, ch. 110, par. 22(3)) does not require that one taking over the defense of another bring all counterclaims or third-party actions for the use and benefit of the other. In the present litigation Commercial, plaintiff's employer, took over the defense of defendant Duggan-Karasik. Commercial took over the defense based upon a hold-harmless provision of the written contract and also the court order of December 17, 1969. Thereafter, Ceco filed a motion which alleged, *inter alia*, that Duggan-Karasik's counterclaim be dismissed because it failed to comply with the provisions of section 22(3) of the Civil Practice Act (Ill. Rev. Stat. 1973, ch. 110, par. 22(3)) which provides: "Any action hereafter brought by virtue of the subrogation provision of any contract or by virtue of subrogation by operation of law shall be brought either in the name or for the use of the subrogee * * *."

The historical and practice notes of Smith-Hurd Annotated Statutes, chapter 110, section 22, state:

> "Section 22 is not a 'real party in interest' provision, such as is found in many codes. Its primary purposes are two-fold: (1) to prevent to some degree the fictitious assignment of non-negotiable claims to collection agencies; and (2) to give a plaintiff at law the right to sue in his own name upon a non-negotiable chose in action, which is a right which always existed in equity."

■■ We are of the opinion that section 22(3) of Chapter 110 does not apply and that Commercial, having taken over the defense of Duggan-Karasik, had a right to continue to prosecute the third-party complaint in the name of Duggan-Karasik. The court erred in dismissing the third-party complaint.

Ceco has filed a "Motion for Clarification of the Record and to Dismiss the Appeal" which we have taken with the case. In its motion to dismiss the appeal, as well as in its brief filed in this court, Ceco maintains that Duggan-Karasik has violated numerous rules of civil and appellate practice. Specifically, Ceco maintains that the notice of appeal and the post-trial motion of Duggan-Karasik are "statutorily" defective. We have considered the notice of appeal and the post-trial motion filed by Duggan-

Karasik and are of the opinion that these are not vulnerable to a motion to dismiss.

Ceco argues that no appeal as to Ceco's verdict against plaintiff was preserved by Duggan-Karasik. Ceco maintains that Duggan-Karasik neither in its post-trial motion nor notice of appeal mentioned that verdict and even if it had done so, it was waived by the failure of Duggan-Karasik to discuss the verdict in its brief. In the present case, the plaintiff had basically two actions, one action against Duggan-Karasik based upon the Structural Work Act, and one action against Ceco based upon the doctrine of strict liability in tort. When the trial court dismissed the counterclaim of Duggan-Karasik against Ceco, there was no issue *inter sese* between the defendants. Thereafter, the jury returned two separate and distinct verdicts on each of these causes of action. However, under the circumstances of this litigation, these verdicts in our opinion determine the plaintiff's right only. We do not believe that it is necessary for Duggan-Karasik to specifically appeal the plaintiff's verdict vis-a-vis Ceco in order to preserve its right to appeal the trial court's dismissal of the third-party action. It is significant to observe that, as stated previously, plaintiff's action against Ceco was based upon strict liability in tort. On the other hand, Duggan-Karasik's third-party action against Ceco was based upon a theory of active-passive negligence. The elements of proof in these two theories of liability are different and we believe that fundamental fairness dictates that Duggan-Karasik be given its day in court as far as an opportunity to offer proof concerning its allegations against Ceco.

Ceco argues that Duggan-Karasik is estopped from contesting the ruling of the trial court on the dismissal of its active-passive indemnity action against Ceco, by the judgment and verdict in favor of Ceco as to plaintiff.

We do not believe that this is an appropriate case for the application of the doctrine of estoppel by verdict. As we have previously observed, the cause of action of the plaintiff against Ceco was based upon strict liability in tort, whereas Duggan-Karasik's cause of action was based upon active-passive negligence. Moreover, Duggan-Karasik and Ceco were not aligned as adversary parties in the prior trial. As the Illinois Appellate Court stated in *Sherman House Hotel Co. v. Butler Street Foundry & Iron Co.*, 168 Ill.App. 549, 554, a case involving an allegation of estoppel by verdict:

> " 'A judgment for or against two or more joint parties ordinarily determines nothing as to their respective rights and liabilities, as against each other, in their own subsequent controversy.' * * *
> 'The estoppel is raised only between those who were adverse

parties in the former suit, so that the judgment therein settles nothing as to the relative rights or liabilities of the co-defendants, *inter sese.*'"

■■ In the present case, the trial court dismissed the third-party complaint of Duggan-Karasik. During the course of the trial, plaintiff controlled the evidence which was presented with respect to the liability of Ceco. Under these circumstances, Duggan-Karasik did not have an adequate opportunity to present its evidence concerning Ceco and consequently it would be unjust to apply the doctrine of verdict by estoppel.

Ceco argues that Duggan-Karasik, being already indemnified by Commercial, could not be entitled to indemnity from Ceco. We see no basis for such a position. The fact that a contractual indemnity agreement existed between Duggan-Karasik and Commercial does not abrogate a further indemnity based upon the doctrine of active-passive negligence.

Ceco argues that an indemnitor who has assumed the responsibility by way of contractual indemnity cannot make a third party liable under common law for its contractual undertakings. In support of this argument, Ceco maintains that in order to state a good cause of action, a third-party complaint or counterclaim should allege a relationship upon which the duty to indemnify is based. Ceco maintains that no such relationship is alleged in the present case.

■ In *Miller v. DeWitt,* 37 Ill.2d 273, 226 N.E.2d 630, the Illinois Supreme Court had occasion to review the nature of active-passive litigation in actions under the Illinois Structural Work Act. In *Miller,* the supreme court held that it was error to dismiss a third-party complaint instituted by an architect against a general contractor even though there was no contract between the two. The supreme court stated:

"We agree with the rationale of these cases, and thus feel that it is proper to recognize the right of indemnity, even in the absence of a specific agreement providing therefor." (*Miller v. De-Witt,* 37 Ill.2d 273, 290, 226 N.E.2d 630, 641.)

(See also *Reynolds v. Illinois Bell Telephone Co.,* 51 Ill.App.2d 334, 201 N.E.2d 322; *Sargent v. Interstate Bakeries, Inc.,* 86 Ill.App.2d 187, 229 N.E.2d 769.) In the present litigation, the indemnitor, Commercial, by taking over the defense of Duggan-Karasik, acceded to all of the rights of Duggan-Karasik. This included a third-party action by Duggan-Karasik against Ceco based upon a theory of active-passive negligence even though there was no contract existing between Duggan-Karasik and Ceco.

We conclude that this is a proper case for a third-party complaint and that the trial court erred in dismissing Duggan-Karasik's third-party complaint on motion without presenting the issue to the jury. On the

present state of the record, it is therefore necessary to remand for a trial to determine the respective rights and liabilities of Duggan-Karasik and Ceco, *inter sese.*

Duggan-Karasik argues that under the Structural Work Act (Ill. Rev. Stat. 1973, ch. 48, par. 60 *et seq.*) a contractor can only be held responsible if he is in charge of the work, and this question is a question of fact for the jury. Defendant Duggan-Karasik maintains that the determination as to whether a particular defendant is "in charge of" has universally been held to be a jury question, and that the trial court erred in taking this issue from the jury.

We believe that defendant Duggan-Karasik's inference that a trial court may never direct a verdict on the issue of "in charge of" is incorrect. The trial court in the present case was guided by the directives enunciated by the supreme court in *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill.2d 494, 510, 229 N.E.2d 504, 513-14, where the court stated:

> "[V]erdicts ought to be directed * * * only in those cases in which all the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand."

We are of the opinion that in judging the propriety of the trial court's direction on the issue of "in charge of," we should apply the *Pedrick* standard.

The record indicates that during the course of the trial, a substantial amount of evidence was offered pertaining to the issue of "in charge of." This evidence primarily concerned defendant Duggan-Karasik. During the course of the trial, plaintiff's exhibit No. 24, the contract entered into between Duggan-Karasik as contractor and the Board as owner, was admitted into evidence. This contract provided, *inter alia,* that Duggan-Karasik "shall efficiently supervise and direct his [superintendent] work, including the work of all sub-contractors, using his best skill and attention." The contract further provided that Duggan-Karasik "shall take all necessary precautions for the safety of employees on the work" and comply with all Federal, state and municipal safety laws and building codes to prevent accidents or injury to persons on, about, or adjacent to the premises where the work is being performed. The contract further provided that Duggan-Karasik construct and safely maintain all scaffolds; designate a responsible member of his organization whose duty shall be the prevention of accidents; and maintain a fulltime superintendent to carry out and coordinate all phases of the work to avoid delays, errors and omissions. It further provided that the superintendent shall give directions as binding as if given by the contractor; agreed that Duggan-Karasik was fully responsible for the supervision

and direction of the work and for the acts and omissions of subcontractors; and that Duggan-Karasik be in general charge of the premises.

We have previously reviewed in detail the affirmative acts of defendant Duggan-Karasik. It is significant to observe that plaintiff's injuries arose directly from Duggan-Karasik's exercise of control and supervision. The evidence adduced at trial indicated that Ken Munson, Duggan-Karasik's superintendent, overruled the recommendation of Commercial as to how the shortspan joists should be moved. Commercial's foreman, Bill Holman, wanted to move the shortspans from outside by using the athletic track. Ken Munson rejected this recommendation and directed that the longspan truss be removed in order to make room to move the shortspan joists over the wall. Plaintiff was engaged in the operation of moving the longspan joist at the time he was injured.

■■ We are of the opinion that the evidence is of such a compelling nature and so overwhelmingly favors the plaintiff on the issue of "in charge of" that no contrary verdict based on this evidence could ever be permitted to stand. The trial court was right in directing the jury to find, as a matter of law, that Duggan-Karasik was "in charge of" the work.

Duggan-Karasik argues that the trial court abused its discretion in permitting plaintiff to amend the ad damnum clause of his complaint immediately prior to the submission of the case to the jury by raising the amount from $100,000 to $400,000. On the day this case was submitted to the jury, plaintiff was granted leave to increase the ad damnum to $400,000.

In *Bail v. Cunningham Bros., Inc.*, 452 F.2d 182 (7th Cir. 1971), the court of appeals considered a case arising under the Illinois Structural Work Act. In *Bail*, the ad damnum of plaintiff's complaint was $100,000; however, the jury returned a verdict in the amount of $150,000. In plaintiff's post-trial motion, he sought and was granted leave to amend his complaint by increasing the ad damnum to $150,000. In affirming the U. S. District Court's action, the 7th Circuit Court of Appeals made the salient observation that:

> "It has been said that the office of the ad damnum in a pleading is to fix the amount beyond which a party may not recover on the trial of his action. *Gable v. Pathfinder Irrigation District*, 159 Neb. 778, 68 N.W.2d 500, 506 (1955). However, an examination of the cases reveals that the rule thus enunciated, if indeed it still be a rule, has flexibility to the virtual point of nonexistence. Thus, in *Gable*, the court pointed out that there was also a general rule that amendment may be made to a pleading which did not change the issues or affect the quantum of proof as to a material fact and

that no good reason was apparent for not applying this privilege of amendment to the ad damnum clause." (*Bail v. Cunningham Bros., Inc.,* 452 F.2d 182, 187-88.)

In *Bail,* the court further observed that they could not see that the quantum of proof as to any material fact varied or that any change of issues resulted, or would have resulted from an amendment to the ad damnum clause. The court in *Bail* further stated that they could "find no basis for an assumption that $100,000 is such as insignificant amount that counsel somehow would try harder if they knew that the exposure might be $250,000." *Bail v. Cunningham Bros., Inc.,* 452 F.2d 182, 189.

The present case, in our opinion, bears an analogy to the *Bail* case. In the present case plaintiff initially had a $100,000 ad damnum. Shortly before the case was submitted to the jury, plaintiff was granted leave to raise his ad damnum to $400,000. Counsel for Duggan-Karasik has not suggested that the quantum of proof as to any material fact varied or that any change of issues resulted from plaintiff's action. Moreover, plaintiff's initial ad damnum; namely, $100,000, is, as the court observed in *Bail,* not such an insignificant amount so as to indicate counsel somehow might have tried harder if he knew the exposure might be $400,000. We are of the opinion that the trial court soundly exercised his discretion in permitting plaintiff to increase his ad damnum.

Duggan-Karasik argues that the court erred in giving an instruction that an inference arises adverse to a party who fails to produce certain evidence. In the instant case, the court gave Ceco instruction No. 6 (IPI Instruction 5.01). This instruction in effect stated that if a party to a case had failed to offer evidence within his power to produce, that the jury may infer that the evidence may be adverse to that party.

We believe it is significant to observe that this instruction was given at the instance of co-defendant Ceco. The record affirmatively shows that plaintiff at no time participated in urging that this instruction be given. Moreover, we are of the opinion that the giving of this instruction has no effect whatsoever as far as the liability of Duggan-Karasik to the plaintiff is concerned.

■■ Under these circumstances, we perceive no resultant prejudice to Duggan-Karasik arising from the court giving this instruction.

Duggan-Karasik argues that under the liberal rules of production in the State of Illinois, a party must give to another party a statement of its employees upon proper motion and cannot invoke an "attorney-client privilege" for such statement when that party has given the statement to other parties to the lawsuit. During the course of the trial, a motion was made by plaintiff Long and by defendant Duggan-Karasik seeking to require Ceco to produce a certain report of its employee and trial

witness, Howard E. Sporleder. This report bore the date of May 17, 1965, and concerned the reason why the longspan bar joist fell. The trial court ordered the attorneys for Ceco to give this statement to plaintiff's counsel; however, defendant Duggan-Karasik alleges that the court refused to order Ceco to give the report to the attorneys for defendant Duggan-Karasik.

■■ The record reveals that Mr. Sporleder was called as a witness during the trial. He testified fully and was cross-examined in detail by attorneys for defendant Duggan-Karasik. The record also indicates that the trial court did not refuse to give Duggan-Karasik the Sporleder report on the basis of "attorney-client privilege." Rather, the record indicates that the basis for the court's refusal to give the report to Duggan-Karasik's attorneys was because Duggan-Karasik had failed to turn over the alleged report of its superintendent, Ken Munson, to Ceco's attorneys. The court granted Duggan-Karasik the opportunity to explain the absence of the report of Ken Munson, in which event the court indicated that the Sporleder report would have been ordered produced. The record indicates that this matter was ultimately left open and that no definitive resolution was reached as between defendant Ceco and defendant Duggan-Karasik. The production of the Sporleder report would have had no bearing on the plaintiff's case against defendant Duggan-Karasik. The trial court did not commit reversible error in its ruling concerning the production of the Sporleder report as issues between Duggan-Karasik and Ceco remain.

Duggan-Karasik argues that the verdict on the question of damages should be reversed because the amount awarded is so excessive as to show prejudice and passion. This defendant states that in determining whether a jury award is excessive so as to show prejudice or passion, the ratio of special damages to the amount of the verdict is a consideration. Defendant states that in the present case, the total amount of medical bills for care and treatment rendered to plaintiff was $3075. Defendant infers that on this basis, the jury verdict in the amount of $175,000 is so excessive as to indicate prejudice.

■■ On the issue of damages, plaintiff produced extensive evidence. The plaintiff's treating physicians, Dr. James P. Zettas and Dr. Robert L. Reschke, testified. Also, Dr. Alan Hirschtick testified as a consulting physician. In addition, plaintiff testified extensively concerning the injuries he sustained and the resultant damages. A review of this evidence indicates that plaintiff suffered numerous injuries as a result of this occurrence and that some of the injuries are of a permanent nature. In addition, the evidence indicates that plaintiff suffered substantial pecuniary loss.

It is a well established rule in Illinois that the amount of a verdict is largely within the discretion of the jury. (*Kahn v. James Burton Co.*, 5 Ill.2d 614, 126 N.E.2d 836; *Holsman v. Darling State Street Corp.*, 6 Ill.App.2d 517, 128 N.E.2d 581; *Lau v. West Towns Bus Co.*, 16 Ill.2d 442, 158 N.E.2d 63.) Moreover, in personal injury cases in which the damages are predicated primarily upon a permanent injury, the fact that medical and hospital expenses may be small is of no controlling significance. (*Trowbridge v. Chicago & Illinois Midland Ry. Co.*, 131 Ill.App.2d 707, 263 N.E.2d 619.) We find that the award is well within the permissible range of the evidence and we cannot perceive any basis for disturbing the jury's determination.

On April 17, 1973, plaintiff filed a motion to strike the report of proceedings, dismiss the appeal or to affirm the judgment, pro forma. We denied the motion. On reconsideration of the motion, we adhere to our previous ruling.

For these reasons the judgment in favor of plaintiff and against Duggan-Karasik is affirmed. The judgment dismissing the third-party complaint of Duggan-Karasik against Ceco is reversed and the cause remanded for trial.

Judgment affirmed in part, reversed in part and cause remanded as to Duggan-Karasik v. Ceco.

GOLDBERG and HALLETT, JJ., concur.