JOHN FRUZYNA, Plaintiff-Appellant, *v.* WALTER C. CARLSON ASSOCIATES, INC., Defendant-Appellee.

First District (1st Division)    No. 78-1737

Opinion filed November 19, 1979.

Nolan, O'Malley & Dunne, of Chicago (Patrick W. Dunne and Michael J. Fogarty, of counsel), for appellant.

Fohrman, Lurie, Holstein, Sklar & Cottle, Ltd., of Chicago, for appellee.

Mr. JUSTICE O'CONNOR delivered the opinion of the court:

Plaintiff, John Fruzyna, brought an action pursuant to the Structural Work Act (the "Act") (Ill. Rev. Stat. 1975, ch. 48, par. 60 *et seq.*) for personal injuries suffered as the result of a fall from a beam at the construction site where he was employed. Plaintiff sued several defendants, including defendant-appellee, Walter C. Carlson Associates, Inc. ("Carlson" or "architect"). The circuit court granted Carlson's motion for summary judgment and made that order final and appealable pursuant to Supreme Court Rule 304(a) (Ill. Rev. Stat. 1975, ch. 110A, par. 304(a)). Plaintiff appeals, contending that a triable issue of fact exists as to whether Carlson was a person "having charge" of the work under the Act.

On September 12, 1975, the day of the accident, plaintiff was employed by D. A. Nichols Co. (Nichols) and was engaged in the erection of structural steel for a warehouse and office building. Boise Cascade ("Boise" or "owner") owned the property. J. Emil Anderson & Son (Anderson) was the general contractor. Nichols was a subcontractor.

The construction contract between Boise and Anderson designated Carlson as the architect for the project. Boise and Carlson also entered into a written contract dated September 30, 1975, for architectural services. Carlson began work pursuant to an oral agreement before the architectural contract was reduced to writing. Accordingly, although the architectural contract was dated after the accident, it evidences Carlson's responsibilities and connections with the construction.

Under the architectural contract Carlson agreed to undertake

administration of the construction contract pursuant to its terms. Carlson was the representative of the owner and all of Boise's instructions to Anderson were to be issued through Carlson. Carlson was to make at least weekly visits to the job site to familiarize himself with the progress and quality of the work. He was to determine whether the work was proceeding in accordance with the contract documents. He was obligated to inform the owner of defects and deficiencies in the work immediately.

The contract further provided that: "The Architect shall not be responsible for construction means, methods, techniques, sequences or procedures, or for safety precautions and programs in connection with the Work * * * ." Based on his observations, Carlson was to determine the amount owing to the general contractor. He was to issue all interpretations required. Carlson had the authority to reject any work not in conformance with the construction contract and to require the contractor to remove and replace rejected work. Carlson was to prepare change orders. Finally, he was obligated to provide all other normal and customary services of an architect.

The construction contract between Boise and Anderson provided Carlson with essentially the same duties expressed in the architectural contract: The architect was to provide general administration of the construction contract. He was designated as the owner's agent and representative. He was allowed access to the work at all times. The architect had authority to reject work (defined to include all necessary labor, materials and equipment) which did not conform to the contract documents. The contractor was required to correct promptly all rejected work. Boise had the right to stop work. Both Boise and Carlson had the right to require that any subcontractor be changed. The general contractor Anderson was responsible "for initiating, maintaining and supervising all safety precautions and programs in connection with the Work." He was obligated to comply with all applicable safety laws, rules and regulations and to maintain all required safeguards. The contractor was also obligated to "designate a responsible member of his organization at the site whose duty shall be the prevention of accidents." Anderson was "solely responsible for all construction means, methods, techniques, sequences and procedures and for coordinating all portions of the Work under the Contract."

Deposition excerpts from Walter Carlson, president of the Carlson corporation, revealed the following: Mr. Carlson was the only architect assigned to the project. He reviewed the construction contract and prepared the architectural contract. Mr. Carlson first visited the construction site approximately nine months prior to the accident. Thereafter he generally made weekly visits to observe the progress of the

work. Mr. Carlson would spend from one to eight hours per visit. He also attended four progress meetings during the course of the construction.

Mr. Carlson testified that if he saw a contractor doing work not in accordance with the contract or specifications, his responsibility was to tell the owner rather than the contractor. Mr. Carlson had occasion to advise the owner that work did not meet specifications. He did not reject any work.

Mr. Carlson was familiar with safe construction practices as well as with Occupational Safety & Health Act (OSHA) regulations concerning construction. If he observed a subcontractor or the general contractor violating a safety practice or an OSHA regulation, he would first inform the Anderson job superintendent, and then Boise. Carlson did not observe any dangerous practices on this job. He did see violations of OSHA regulations and informed both Anderson and Boise. Carlson never made a report to Boise as to whether or not Anderson was complying with his contractual requirements regarding safety. Carlson had no conversations with the foreman from Nichols (plaintiff's employer) nor did he observe work being done by Nichols.

This cause comes to us on appeal from the granting of a motion for summary judgment. Summary judgment may be granted only when the pleadings, affidavits, exhibits and depositions on file show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. (Ill. Rev. Stat. 1975, ch. 110, par. 57.) The purpose of summary judgment procedure, then, is not to try an issue of fact, but rather to determine whether a question of fact exists. *Weber v. Northern Illinois Gas Co.* (1973), 10 Ill. App. 3d 625, 635, 295 N.E.2d 41.

■■ Summary judgment is "a remedy to be awarded with some caution so as not to preempt the right to trial by jury or the right to fully present the factual basis for a case where a material dispute may exist." (*Lumbermens Mutual Casualty Co. v. Poths* (1968), 104 Ill. App. 2d 80, 87, 243 N.E.2d 40.) While the pleadings, affidavits, exhibits and depositions should be construed strictly against the party moving for summary judgment and liberally in favor of the opponent (*Shockley v. Ryder Truck Rental, Inc.* (1979), 74 Ill. App. 3d 89, 392 N.E.2d 675), summary judgment is a means to avoid the expense and delay of trial where no genuine issue of fact exists. (*Rivan Die Mold Corp. v. Stewart Warner Corp.* (1975), 26 Ill. App. 3d 637, 325 N.E.2d 357.) Its use is to be encouraged in a proper case as it benefits both litigants and the community. *Allen v. Meyer* (1958), 14 Ill. 2d 284, 152 N.E.2d 576.

■■ Section 9 of the Structural Work Act (Ill. Rev. Stat. 1975, ch. 48, par. 69) provides in part:

"Any owner, contractor, sub-contractor, foreman or other

> person having charge of the erection, [or] construction * * * of any building * * * within the provisions of this act, shall comply with all the terms thereof * * * .
>
> * * *
>
> For any injury to person * * * occasioned by any wilful violations of this act, or wilful failure to comply with any of its provisions, a right of action shall accrue to the party injured, for any direct damages sustained thereby; * * * ."

For a defendant to be culpable under the Act, he must be one "having charge" of the work. (*Gannon v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co.* (1961), 22 Ill. 2d 305, 175 N.E.2d 785.) More than one person or entity may have charge of the work. (*Carlson v. Metropolitan Sanitary District* (1965), 64 Ill. App. 2d 331, 213 N.E.2d 129.) The issue of who has charge is generally a question of fact for the jury. (*Gannon.*) Nonetheless, "there may be insufficient evidence to create a factual question of whether a defendant has charge of the work." *Norton v. Wilbur Waggoner Equipment Rental & Excavating Co.* (1979), 76 Ill. 2d 481, 486, 394 N.E.2d 403.

Whether or not an architect has charge is determined not only from written contracts but also from the surrounding circumstances and from the role he in fact assumed. *McGovern v. Standish* (1975), 33 Ill. App. 3d 717, 341 N.E.2d 739, *affirmed* (1976), 65 Ill. 2d 54, 357 N.E.2d 1134.

Perhaps the leading case construing the long-disputed phrase "having charge" is *Larson v. Commonwealth Edison Co.* (1965), 33 Ill. 2d 316, 211 N.E.2d 247. *Larson* rejected a jury instruction providing that defendants (an owner-general-contractor and an engineering firm) could only be found liable if they retained control and supervision of the work being performed. *Larson* afforded weight to the numerous and diverse evidentiary factors which showed a connection of authority or an obligation of overall responsibility for the construction work (33 Ill. 2d 316, 321-22):

> "* * *. The term 'having charge of' is a generic term of broad import, and although it may include supervision and control, it is not confined to it. As was said of the word 'charge' in *People v. Gould*, 345 Ill. 288, 323: 'The word does not necessarily include custody, control or restraint, and its meaning must be determined by the associations and circumstances surrounding its use. "To have charge of" does not necessarily imply more than to care for or to have the care of.' Thus, while the actual exercise of supervision and control over the work and the persons doing it, or the retention of the right to so supervise and control, may be factors bearing on the ultimate factual question of whether an owner is 'in charge,' they are not necessary or conclusive factors, nor is either made a

*sine qua non* for liability under the statute. Rather, consistent with its beneficent purpose of preventing injury to persons employed in the extra-hazardous occupation of structural work, the thrust of the statute is not confined to those who perform, or supervise, or control, or who retain the right to supervise and control, the actual work from which the injury arises, but, to insure maximum protection, is made to extend to owners and others who have charge of the erection or alteration of any building or structure."

After *Larson*, our supreme court decided three structural work act cases involving architects: *Miller v. DeWitt* (1967), 37 Ill. 2d 273, 226 N.E.2d 630; *McGovern v. Standish* (1976), 65 Ill. 2d 54, 357 N.E.2d 1134; and *Emberton v. State Farm Mutual Automobile Insurance Co.* (1978), 71 Ill. 2d 111, 373 N.E.2d 1348.

In *Miller*, plaintiffs were employed by the general contractor and were injured when a roof collapsed due to inadequate shoring. Jury verdicts against the owner and architect were affirmed by the appellate court and by the supreme court. Contract provisions gave the architect the duty to supervise the work to guard the owner against defects and deficiencies and the authority to stop the work if " 'necessary to insure the proper execution of the Contract.' " (37 Ill. 2d 273, 282.) The contractor was charged with the duty to take all necessary safety precautions. The court held that these provisions gave the architect the right to stop work being done in a dangerous manner.

In *McGovern v. Standish*, defendant-architect's motion for a directed verdict was denied and the jury returned a verdict for plaintiff. The appellate court reversed and the supreme court affirmed this reversal. The supreme court distinguished *Miller*, stating (65 Ill. 2d 54, 68-69):

> "[W]e do not read *Miller* as holding that the right to stop the work, without more, is conclusive in resolving the question of whether a person has charge of the work within the meaning of the Act. (See *Voss v. Kingdon and Naven, Inc.*, 60 Ill. 2d 520, 526-27; *McInerney v. Hasbrook Construction Co.*, 62 Ill. 2d 93, 103-04.) Rather, such a determination must rest upon an assessment of the totality of the circumstances.
>
> Furthermore, we do not believe that the defendant in the instant case had the right to stop the work, in the sense that the right was discussed in *Miller*. In *Miller*, we referred to 'the architects' right to stop the work *if it were being done in a dangerous manner* * * *.' (Emphasis added.) (37 Ill. 2d 273, 286.) The record in the instant case does not establish that the defendant had any comparable right. The defendant was recognized as having the right to reject defective materials and workmanship and require its correction. Even if we read into this clause a right to stop the work in the case

of improper construction, a reading by no means compelled by the language employed, it does not follow that the defendant had the right to stop the work where dangerous methods not affecting the quality of the construction were utilized. Also, while the architect could certify to the owner that sufficient cause existed for the termination of the contractor's employment and the stopping of the work, the clause so providing allowed action only by the owner and only then upon 10 days' notice to the contractor. Clearly, this clause does not permit the type of immediate cessation or suspension of activity contemplated by *Miller*."

The court in *McGovern* stated that in order to find a defendant "in charge": "* * * the defendant must have been in charge of the particular operations which involved the violation from which the alleged injury arose. [Citations.]" 65 Ill. 2d 54, 67.

In *Emberton v. State Farm Mutual Automobile Insurance Co.* (1978), 71 Ill. 2d 111, 373 N.E.2d 1348, the court criticized this language, but did not overrule *McGovern*. Instead, the court offered a clarifying interpretation (71 Ill. 2d 111, 119):

"If the language in the majority opinion in *McGovern* was intended to mean that it may be shown that a person was 'in charge of the particular operations which involved the violation from which the alleged injury arose' (65 Ill. 2d 54, 67) either by proof that he exercised control, or that the right to control the work existed, whether exercised or not, it correctly states the law. As construed by the appellate court in this case, the holding is clearly erroneous."

Nonetheless, the *McGovern* court's analysis and application of *Miller* (65 Ill. 2d 54, 68-69, quoted above) was not discounted by the *Emberton* court. Indeed, application of the criticized language in *McGovern* merely buttressed that court's reliance on the authority of *Miller* (65 Ill. 2d 54, 69):

"In addition to those factors present in *Miller* and *Voss* and absent here, we note that the evidence does not establish that the defendant had any right to control or direct the manner or methods by which the construction would be accomplished. Moreover, the undisputed testimony at trial was to the effect that the defendant had never attempted to exercise any control over the work by issuing orders or directives to those associated with the construction."

The fact that *McGovern* is still good law as "clarified" by *Emberton* was reaffirmed recently in *Norton v. Wilbur Waggoner Equipment Rental & Excavating Co.* (1979), 76 Ill. 2d 481, 394 N.E.2d 403. *Norton* emphasized that the *McGovern* court found for the architect because of at least three evidentiary factors (76 Ill. 2d 481, 489-90):

"First, the architect did not have the right to stop the work, as contemplated by *Miller v. DeWitt* (1967), 37 Ill. 2d 273, 284, 286, because stoppage could only occur upon 10 days' notice. Second, the architect's right to supervise, together with the ancillary right to inspect, was simply a duty to see that contractual specifications were met. Third, the architect's authority was not broad or sweeping (as in *Voss v. Kingdon & Naven, Inc.* (1975), 60 Ill. 2d 520, where the defendant had authority to discharge workers and suspend work). * * *"

In short, *McGovern* was correctly decided for the three reasons stated above, but certain language that erroneously and unnecessarily narrowed the meaning of the term "in charge of" has been "clarified."

Turning to the merits of *Emberton,* the court found there was sufficient evidence from which the jury could find defendant-architect "in charge of" the work. Pertinent contract provisions provided (71 Ill. 2d 111, 122):

" '1.1.17 The Architect shall have authority to reject Work which does not conform to the Contract Documents. The Architect shall also have authority to require the Contractor to stop the Work whenever in his reasonable opinion it may be necessary for the proper performance of the Contract. The Architect shall not be liable to the Owner for the consequences of any decision made by him in good faith either to exercise or not to exercise his authority to stop the Work.' "

Differences in the contract language in *Emberton* and *Miller* were viewed as semantical rather than substantive. Accordingly, the court determined that defendant-architect had the right to stop work because of deficiencies on safety.

Similarly, the appellate courts of this State have been guided by *Miller* when confronted with issues of architect liability in Structural Work Act litigation. See, *e.g., Kelly v. Northwest Community Hospital* (1978), 66 Ill. App. 3d 679, 384 N.E.2d 102; *Meek v. Spinney, Coady & Parker Architects, Inc.* (1977), 50 Ill. App. 3d 919, 365 N.E.2d 1378; *Getz v. Del E. Webb Corp.* (1976), 38 Ill. App. 3d 880, 349 N.E.2d 682.

In *Kelly,* the appellate court affirmed the granting of defendant architect's summary judgment motion. The pertinent contract provisions were (66 Ill. App. 3d 679, 684):

" 'The Architect shall make periodic visits to the site to familiarize himself generally with the progress and quality of the Work and to determine in general if the Work is proceeding in accordance with the Contract Documents. On the basis of his on-site observations as an Architect, he shall endeavor to guard the Owner against defects and deficiencies in the Work of the

Contractor. The Architect shall not be required to make exhaustive or continuous on-site inspections to check the quality or quantity of the Work. The Architect shall not be responsible for construction means, methods, techniques, sequences or procedures, or for safety precautions and programs in connection with the Work, and he shall not be responsible for the contractor's failure to carry out the Work in accordance with Contract Documents.' "

The court found that "absent a provision in the employment contract charging the architect with administration of the construction contract, control of methods or techniques of construction used, and the authority to stop the work when necessary" (66 Ill. App. 3d 679, 684), no liability would attach.

In *Meek*, the court affirmed the dismissal of a complaint against defendant-architect, because the contract did not provide a right to stop the work. In addition, the architect had no continuous supervision duties but merely made weekly visits to determine if the work was proceeding according to plan.

In *Getz*, the court affirmed a directed verdict for defendant-architect because the architect was only present occasionally; there was no duty of general supervision and no right to stop the work. But *c.f. Voss v. Kingdon & Naven, Inc.* (1975), 60 Ill. 2d 520, 328 N.E.2d 297 (consulting engineer not entitled to directed verdict where he had the duty of continuous inspection, authority to fire any employees of the contractor and the right to stop work).

With the aforementioned principles in mind, we turn to factors in the present case. The parties devote extensive discussion to whether or not Carlson possessed the right to stop the work. In our view, his contract specifies that he did not. The owner alone had the right to stop the work, and the architect had the duty to reject nonconforming work and to require the contractor to remove and replace rejected work. The right to stop work and the power to reject nonconforming work are not equivalent. (See *McGovern*, 65 Ill. 2d 54, 68.) Moreover, we reject plaintiff's argument that there is an implied power to stop the work for dangerous construction practices. It is proper to infer the right to stop the work for dangerous construction practices from the right to stop work not conforming to the contract. (*Miller*.) However, this court may not infer the right to stop work from the right to reject work. The authority to stop work must be clear and not assumed. *Daniels v. Weiss* (1974), 17 Ill. App. 3d 294, 308 N.E.2d 46.

The right to stop work is not conclusive as to whether Carlson had charge of the work. (*McGovern*.) Rather, we must evaluate the "totality of the circumstances" (*Norton*) evidenced by Carlson's contractual obligations and job site conduct and contacts. (See *Long v. Duggan-*

*Karasik Construction Co.* (1974), 23 Ill. App. 3d 812, 320 N.E.2d 553.) Carlson's contractual duties included the general administration of the construction contract. He was the owner's agent. He generally made weekly visits to the construction site to determine if the work was proceeding in accordance to the contract documents. He was obligated to inform the owner of defects and deficiencies in the work immediately. Carlson did not observe any dangerous practices, but he did observe and report some OSHA violations. He was to prepare change orders. Both the architect and the owner could require that a subcontractor be changed. Carlson attended four progress meetings during the course of the construction. He had one occasion to inform the owner that work did not meet specifications. He did not reject any work. Carlson was familiar with safe construction practices and OSHA safety regulations. Carlson never reported to the owner whether contractual requirements regarding safety were being met. Finally, the contracts provided:

> "The Architect shall not be responsible for construction means, methods, techniques, sequences or procedures, or for safety precautions and programs in connection with the work."

■■ We believe that under *Miller* and its progeny, the totality of the above factors is insufficient to create a triable issue of fact and that Carlson was not in charge of the work as a matter of law. Carlson had no authority to stop the work, had no control of construction methods or techniques, was not responsible for safety precautions and programs, had no continuous supervision duties. The architect's right to supervise or administrate the contract, together with the ancillary duty to inspect, were simply duties to see that contractual specifications were met. Accordingly, we are of the opinion that the trial court correctly granted summary judgment to the architect.

Subsequent to the trial court's decision, our supreme court declined to set exact boundaries for "having charge," but emphasized the expansiveness of the concept in *Norton v. Wilbur Waggoner Equipment Rental & Excavating Co.* (1979), 76 Ill. 2d 481, 394 N.E.2d 403. *Norton* dealt with the liability of a school district owner as an entity having charge of the work. The court reinstated a jury verdict against the school district. A pivotal factor in the court's decision was that the school district employed Delaney as "Clerk of the Works for the construction." Delaney had a duty to inspect the construction and was to assure specifications were met. He had an office at the construction site and was there five days a week. He attended weekly meetings with the architect, contractors and subcontractors. Moreover, he was an experienced contractor himself, was familiar with and had been on the bar joists on which plaintiff was injured. There was also evidence that Delaney would be the first to know of any deviations and would report them to the architect. Testimony also

established Delaney had significant supervisory input regarding the construction, including having work redone at his direction. Delaney served as liaison between the contractor and architect.

The school board had the right to inspect the construction, including for safety, and could terminate the contract upon 10 days' notice to the contractor. The owner also could order extra work, had to approve and could make changes, and had access to the work at all times. Regarding these factors, the supreme court concluded (76 Ill. 2d 481, 491):

> "Our review of the evidence demonstrates retention of supervision and control of the construction by the school district. Even if that were not so, assessment of the totality of the circumstances shows the school district was sufficiently in charge of the construction to justify a finding of liability. Delaney daily made inspections and had work redone. He was generally familiar with construction methods and specifically familiar with the bar joists; hence, he was in a peculiarly appropriate position to be the 'first one to know if there is some deviation' and have it alleviated, either at his direction or through the architect. Although the inability to 'stop' the work or terminate a contract before the lapse of 10 days might be decisive in another case, it is not here. We find from the evidence this is not a case in which 'the manner of doing the work was left up' entirely to the contractor. *Carruthers v. B. C. Christopher & Co.* (1974), 57 Ill. 2d 376, 378."

Under the "totality of the circumstances" test, each case must be viewed with respect to its own particular factors. We believe that the factors present in *Norton* are not sufficiently analogous to the instant case to require reversal. Specifically, the extensive control, familiarity with the operations from which plaintiff's injury arose, and presence of the "Clerk of the Works" are lacking here. We find no facts in this record and see no indication that additional facts could be adduced at trial capable of supporting a finding that the architect was liable under the Act. See, *e.g.*, *Carruthers v. B. C. Christopher & Co.* (1974), 57 Ill. 2d 376, 313 N.E.2d 457.

Accordingly, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

GOLDBERG, P. J., and McGLOON, J., concur.