LARRY A. HAUSAM, Plaintiff-Appellant and Cross-Appellee, *v.* VICTOR GRUEN & ASSOCIATES, Defendant-Appellee and Cross-Appellant.

Third District   No. 79-176

Opinion filed July 31, 1980.

Charles R. McGuire and Thomas V. Cassidy, both of Peoria, for appellant.

David B. Mueller, of Cassidy, Cassidy, Mueller & Price, of Peoria, for appellee.

Mr. JUSTICE STENGEL delivered the opinion of the court:

Plaintiff Larry A. Hausam was seriously injured when he fell 16 feet from a scaffold while employed in the construction of the Carson Pirie Scott & Company store at Northwoods Shopping Center mall in Peoria, Illinois. On October 22, 1972, at the time plaintiff was injured, he was pushing a wheelbarrow of wet concrete along the scaffold to a columnar form in the process of constructing second floor columns in the building. As he neared the end of the scaffold, he and the wheelbarrow broke through the railing, and he fell to the floor below, landing with the wheelbarrow and wet concrete on top of him. The scaffold was constructed of tubular steel, but instead of having two railings of 2 x 4 boards and a toeboard, as required by the Occupational Safety and Health Act (OSHA) regulations, the section of scaffold where the accident occurred had only a 2 x 2 board as a single hand rail.

Plaintiff filed suit against, *inter alia*, defendant Victor Gruen & Associates, the architect employed by the owner to plan and design the Northwoods store, asserting a cause of action under the Structural Work Act (Ill. Rev. Stat. 1971, ch. 48, par. 60, *et seq.*). At the conclusion of the trial of this cause in the Circuit Court of Peoria County, the jury returned a verdict in favor of plaintiff in the sum of $75,000, and the court entered judgment accordingly. Plaintiff appeals upon the ground that the verdict was insufficient, and defendant cross-appeals upon the ground that, as a matter of law, no liability should attach to the architect in this case.

■■ Because of the view we take of this appeal, the determinative issue is whether defendant was in charge of the construction within the meaning

of section 9 of the Structural Work Act, which imposes liability upon "[a]ny owner, contractor, sub-contractor, foreman or other person having charge of the erection, construction, repairing, alteration, removal or painting of any building \* \* \*" for any injury caused by a wilful violation of the Act. (Ill. Rev. Stat. 1979, ch. 48, par. 69.) In resolving this issue, we are mindful that the question of who has charge of construction is usually a question of fact for the jury, and a verdict in favor of plaintiff can be reversed only if the evidence, when viewed most favorably to the plaintiff, nevertheless so overwhelmingly favors the defendant that no contrary verdict could stand. See *Norton v. Wilbur Waggoner Equipment Rental & Excavating Co.* (1979), 76 Ill. 2d 481, 394 N.E.2d 403; *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.

The test of whether a party is in charge of the work involves an assessment of the totality of the circumstances in each case. (*Norton.*) In the recent case of *Westerfield v. Arjack Co.* (1979), 78 Ill. App. 3d 137, 397 N.E.2d 451, the court identified a number of factors which should be considered in determining whether the totality of the circumstances establishes that a party had charge of the work: (1) actual supervision and control of the work; (2) retention of the *right* to supervise and control; (3) constant participation in ongoing activities at the construction site; (4) supervision and coordination of subcontractors; (5) responsibility for taking safety precautions at the job site; (6) authority to issue change orders; (7) the right to stop the work.

The breadth of the doctrine of "having charge of," as interpreted by the Illinois courts, was discussed in *Alfano v. Board of Trade* (1979), 76 Ill. App. 3d 248, 251, 395 N.E.2d 384, 386, as follows:

> "Recently, in *Norton*, the Illinois Supreme Court emphasized the expansiveness of the concept of having charge of the work. There, the court noted that even in the absence of evidence of retention of supervision or control over the work, a party with a general familiarity with construction methods, specific knowledge of the problem in question, some control over some of the work at the jobsite and in the position to have knowledge of 'some deviation' in the work and the ability to alleviate it either at his own direction or through another could be one 'having charge of' an alteration for purposes of liability under the Act."

*Norton* and several subsequent cases which imposed liability under this expansive concept were cases where the defendant was the owner of the construction project. (*E.g., Kirk v. Walter E. Deuchler Association, Inc.* (1979), 79 Ill. App. 3d 416, 398 N.E.2d 603; *Molloy v. Santucci Construction Co.* (1979), 78 Ill. App. 3d 249, 397 N.E.2d 125; *Mosley v. Northwestern Steel & Wire Co.* (1979), 76 Ill. App. 3d 710, 394 N.E.2d 1230; *Kjellesvik v. Commonwealth Edison Co.* (1979), 73 Ill. App. 3d 773,

392 N.E.2d 116.) While architects, as such, are not named in the statute, in many cases the architect has been found to be an "other person having charge of" construction within the meaning of the Act, and the same principles apply to that determination as apply to owners and contractors.

The supreme court's most recent consideration of an architect's liability under the Structural Work Act was in *Emberton v. State Farm Mutual Automobile Insurance Co.* (1978), 71 Ill. 2d 111, 373 N.E.2d 1348, where the architect had a full-time project representative who made frequent inspections of the work, who attended weekly progress and coordination meetings, who called the contractor's attention to unsafe conditions, and who gave directions as to the methods for doing certain work. In addition, the architect had express authority under its contract "to stop the Work whenever in his reasonable opinion it may be necessary for the proper performance of the Contract."

In finding the architect culpable, the court in *Emberton* quoted with approval an analysis of the "having charge" concept from *Larson v. Commonwealth Edison Co.* (1965), 33 Ill. 2d 316, 211 N.E.2d 247. In *Larson,* the court said:

"While it may be conceded that some of the decisions in this jurisdiction involving the Scaffold Act appear to have equated 'having charge' with 'supervision and control' in varying degrees, it is our opinion the language of the statute, and the legislative intent it reflects, do not permit the conclusion that the terms are the inflexible and unbending legal equivalent of the other. The term 'having charge of' is a generic term of broad import, and although it may include supervision and control, it is not confined to it. As was said of the word 'charge' in *People v. Gould*, 345 Ill. 288, 323: 'The word does not necessarily include custody, control or restraint, and its meaning must be determined by the associations and circumstances surrounding its use. "To have charge of" does not necessarily imply more than to care for or to have the care of.' Thus, while the actual exercise of supervision and control over the work and the persons doing it, or the retention of the right to so supervise and control, may be factors bearing on the ultimate factual question of whether an owner is 'in charge,' they are not necessary or conclusive factors, nor is either made a *sine qua non* for liability under the statute. Rather, consistent with its beneficent purpose of preventing injury to persons employed in the extra-hazardous occupation of structural work, the thrust of the statute is not confined to those who perform, or supervise, or control, or who retain the right to supervise and control, the actual work from which the injury arises, but, to insure maximum protection, is made to extend to owners and others who have charge of the erection or

alteration of any building or structure." 33 Ill. 2d 316, 321-22, 211 N.E.2d 247, 251.

As we understand *Larson* and *Emberton,* the statute extends liability to those having some responsibility and opportunity to prevent dangerous work methods at the construction site in general, without regard to their having a direct supervisory connection with the particular task which gave rise to·the injury.

One of the important considerations in cases involving architects is the extent of the architect's authority to "stop work" under the contract. In *Emberton,* the architect could stop the work when necessary for the proper performance of the contract. This language was held to confer a right to stop work because of safety hazards, thereby making the architect a person having charge of the work within the meaning of the Act. See *Miller v. DeWitt* (1967), 37 Ill. 2d 273, 226 N.E.2d 630.

In *Fruzyna v. Walter C. Carlson Associates, Inc.* (1979), 78 Ill. App. 3d 1050, 398 N.E.2d 60, the court considered the "stop work" factor in a case where the contract authorized the architect to reject work which did not conform to the contract documents but gave the right to stop work only to the owner. The court held that the right to stop work and the power to reject nonconforming work are not the same thing. "[T]his court may not infer the right to stop work from the right to reject work. The authority to stop work must be clear and not assumed." (78 Ill. App. 3d 1050, 1058, 398 N.E.2d 60, 66.) Although the architect in *Fruzyna* had a contractual duty to administer the contract, to prepare change orders, and to reject work, and even though he made weekly visits to the site and attended progress meetings, he was held not to be in charge of the work as a matter of law because he had no authority to stop work, no control over construction methods or techniques, was not responsible for safety, and had no continuous supervision duties.

A similar result was reached in *Diomar v. Landmark Associates* (1980), 81 Ill. App. 3d 1135, 401 N.E.2d 1287, where the court also held that the right to reject work which fails to conform to the contract cannot be interpreted as the right to stop work when hazardous conditions or methods of construction existed. The court stated:

"Plaintiff infers [the architect's] 'having charge of' or 'direct connection' with the work from the contractual requirements of the architect's periodic visits to the site, his determination of the amounts owing to the contractor based upon those visits, his issuances of interim and final certificates of payment for work performed in accordance with the contractual documents and applicable laws, his determination of dates of substantial completion of the work, and his right to prepare change orders under sections 1.1.14, 1.1.15, 1.1.19 and 1.1.20 of the AIA contract.

The foregoing provisions, without more, form no basis upon which to impute such responsibility; rather, as the supreme court has held, these contractual duties, the affidavit and exhibits show no more than a general requirement that the architect oversee the work performed in order to insure the completion of the project and conformity with the plans and specifications, and to preclude payment for those services rendered by the contractor which fail to comply therewith." (81 Ill. App. 3d 1135, 1142-43, 401 N.E.2d 1287, 1292.)

The reviewing court then affirmed the entry of summary judgment in favor of defendant architect.

With these decisions before us, we turn to the circumstances of the case at bar. Here the architect's contract with the owner does not appear to be a standard AIA contract and is fairly short. Section 2 sets out the services which shall be rendered by the architect, including, during the construction phase, "Checking of shop drawings for architectural, structural and mechanical trades" and "Periodic observation of construction work." The crucial provisions relating to construction services are as follows:

"The purpose of our checking shop drawings and making periodic observations of the work performed by the contractors is to ascertain whether the work is executed in conformity with the working drawings and specifications and other contract documents. We shall endeavor by this procedure, to guard you against defects and deficiencies in construction; however, we do not guarantee, or assume responsibility for, the performance of the respective contracts or duties of the contractors.

Our periodic observation of the work performed by a contractor is to be distinguished from continuous on-the-site inspection of a Project Representative. If requested by you, we will assist you in engaging a full-time Project Representative at your expense and for and on your behalf. The engagement and the rights and responsibilities in connection with such engagement shall be subject to mutual agreement between you and us."

A full-time project representative was never employed. During the 12- to 14-month period of construction, defendant Gruen subcontracted its construction duties to Thomas Mizera, an architect from Park Ridge, Illinois, who testified that he went to the job site one day each month so that he could prepare a certification of progress to accompany the contractor's request for payment. There was no evidence that Mizera ever issued a field order or a change order, and there was uncontradicted evidence that he never stopped the work or rejected any work or told the contractor the manner or method for accomplishing his work. Although

the construction contract between the owner and the general contractor is not in the record before us, the evidence does indicate that the contractor had responsibility for safety at the job site. The architect's contract here is similar to that in *Diomar v. Landmark Associates*.

■ When the totality of the circumstances in the instant case is compared with those cases discussed earlier, it seems clear that here defendant did not have charge of the work at the construction site where plaintiff was injured. Under the contract defendant had no authority to stop work for any reason, had no responsibility as to safety construction practices, had no express right to reject work, and had no duty to make continuous or frequent inspections. In actuality defendant's agent Mizera visited the site for a part of one day each month, made absolutely no attempt to supervise or exert any authority at the job site, and confined his efforts solely to noting the progress of construction work in order to certify the appropriate partial payouts to the contractor. Furthermore, Mizera was not at the site while the allegedly defective scaffold was in existence.

After carefully reviewing the record, we find that the architect's relationship to the construction work was minimal and that those factors relied upon to impose liability in the *Emberton* case are not present here. Under the *Pedrick* test, there is no basis in the evidence for holding defendant liable. To hold otherwise would have the effect of imposing absolute liability upon defendant solely because of his status as architect, in direct contravention of the statutory requirement that liability be imposed upon those who have charge of the work. (*Gannon v. Chicago, Milwaukee, St. Paul & Pacific Ry.* (1961), 22 Ill. 2d 305, 175 N.E.2d 785.) We therefore reverse the judgment of the Circuit Court of Peoria County.

Reversed.

STOUDER and SCOTT, JJ., concur.