No. 54,238

DUONE HANNA and O. D. PEARMAN, *Appellees,* v. HUER, JOHNS, NEEL, RIVERS AND WEBB, *Appellant.*

(662 P.2d 243)

Opinion filed April 20, 1983.

*Jerry G. Elliott,* of Foulston, Siefkin, Powers & Eberhardt, of Wichita, argued the cause, and *E. Lael Alkire,* of Wichita, was with him on the brief for appellant.

*Ralph E. Skoog,* of Ralph E. Skoog, P.A., of Topeka, argued the cause, and *Gene E. Schroer* and *Dan L. Wulz,* of Jones, Schroer, Rice, Bryan & Lykins, Chartered, of Topeka, were with him on the brief for appellees.

The opinion of the court was delivered by

HOLMES, J.: This is an appeal by the defendant, Huer, Johns, Neel, Rivers and Webb, a professional corporation and formerly a partnership, (hereafter Huer, Johns, or the architect) from two judgments entered upon jury verdicts in favor of two construction workmen for personal injuries received on the construction jobsite. The injured workmen, O. D. Pearman and Duone Hanna, filed separate suits which were consolidated for trial in the district court. Huer, Johns appeals from each judgment and the cases remain consolidated on appeal.

The plaintiffs were ironworkers employed by American Construction Erection Services Company, Inc., of Wichita (ACESCO). ACESCO was hired as a subcontractor to erect the structural steel in the construction of a Dillard's department store building in Wichita's Towne East Shopping Center. ACESCO was hired by The Law Company of Wichita. The Law Company was technically a subcontractor itself under the general contractor, Pickens & Bond Construction Company of Little Rock, Arkansas. The Law Company, however, functioned in the manner of a general contractor on the project site and will be considered as such for the purposes of this appeal, and will be referred to as the general contractor. Huer, Johns, under a contract with the project owner Dillard's, was responsible for drafting the documents for the owner-builder contract, including the plans, specifications and general conditions and was also responsible for the general administration of the construction contract.

The accident which injured Hanna and Pearman occurred about 3:00 p.m. on October 18, 1974. At that time Hanna was the foreman of the detail gang for ACESCO. Pearman was a welder on Hanna's crew. The detail gang was responsible for permanently securing the structural steel once it had been put into place by the company's raising gang. The unfortunate accident which resulted in serious injuries to each plaintiff occurred when a steel tie joist that Pearman was sitting on at an upper level of the building's steel skeleton fell, hitting Hanna, knock-

ing him to a lower level floor and then into an elevator shaft. The tie joist that Pearman was sitting on should have been secured by the raising gang to the steel structure at one end by either bolting or tack welding, but was not. In addition the joist was not the proper length and was fabricated for use in another part of the building. The combination of the tie joist being too short and the failure to secure it at one end to the steel beam resulted in the joist being dislodged from its position and the injuries to the plaintiffs. Plaintiffs assumed the joist was properly secured at one end when, in fact, it was kept aloft merely because each end was resting upon beams which were already in place. Pearman made no inspection of the length of the joist nor determined if it was securely fastened to the beam and Hanna could not see the ends of the joist from his position below.

Plaintiffs originally filed suit against their employer, the general contractors on the job, the steel fabricator, the owner and the architect. At the time of trial, Huer, Johns was the only viable defendant remaining in the action for the purpose of liability although the jury was instructed to apportion the comparative fault for the accident in each case among each plaintiff, the general contractors, the employer, the owner and the defendant Huer, Johns.

Plaintiffs' action was based upon two theories of liability, both based upon negligence. First, they contend that the employment contract between Huer, Johns and Dillard's included the responsibility for safety precautions upon the project. It is contended that ACESCO was notoriously derelict in providing safe working conditions and that if defendant had not been negligent in the performance of its contractual duties in administering the construction of the project the accident would not have happened. Second, it is contended that if Huer, Johns did not breach its contractual duties it was at least guilty of negligence which was the proximate cause of plaintiffs' injuries. Defendant, on the other hand, asserted there was no contractual duty to supervise or maintain safety standards on the project and that there was no professional negligence on its part. Huer, Johns had been the architects for Dillard's on several construction projects and did not have a written contract of employment apart from the contract between Dillard's and the general contractor.

Clyde Webb, a principal in Huer, Johns, testified that it was

his firm's responsibility under its oral contract with Dillard's to design the building, develop the contracts, plans and specifications and "get it built." The contract documents prepared by Huer, Johns included the plans, drawings, specifications and American Institute of Architects Document A201. A201, along with the plans, etc., described therein and collectively called the contract documents, constituted the construction contract between the owner and the general contractor. Although Huer, Johns was not a party signatory to that contract, in addition to setting out the agreements between the owner and the general contractor, it also specifies the duties of the architect and contains certain provisions pertaining to the subcontractors. All parties rely on certain provisions of A201 and there is no serious contention that A201 is not a part of the oral agreement between Huer, Johns and Dillard's. Plaintiffs contend that under the oral employment agreement, including A201, Huer, Johns was responsible for safety conditions on the project; that ACESCO was notorious for its failure to follow safety procedures; that defendant knew or should have known ACESCO was sloppy and careless in its work and therefore Huer, Johns was liable for plaintiffs' injuries.

There was considerable testimony about the careless procedures followed by ACESCO and such unsafe practices were well known to The Law Company's safety man on the project, to its superintendents and to plaintiffs who had been employees of ACESCO for some time. However, it is also clear that no one ever advised Huer, Johns of the numerous problems being experienced with ACESCO.

Mr. Webb said he visited the construction site on occasion and others from his firm visited the site periodically for the purpose of fulfilling Huer, Johns' obligation to the project owner to make certain that the construction was progressing satisfactorily and conformed to the plans and specifications. It was Huer, Johns' obligation to require that the contractor lived up to its agreement with the owner. Huer, Johns periodically approved completed work in order for the builders to be paid. Webb testified that he never made any inquiries about jobsite safety and that safety was not part of Huer, Johns' responsibility. He knew The Law Company, which was acting as the general contractor on the project, had a safety program and a safety man on the project, and

he was satisfied with that knowledge. He also testified he was not aware of any safety problems with ACESCO and had been advised of none.

Steven Harrell, an employee of The Law Company, was its safety inspector and responsible for safety conditions on the construction project. He testified that his function was to make inspections and review the subcontractors' work. In his view, ACESCO was obviously and notoriously guilty of unsafe practices. He pointed out that ACESCO was the subcontractor responsible for an earlier collapse of the structural steel skeleton in another part of the shopping center unrelated to this building. He claimed that ACESCO's violations of the standard safety practices of the steel industry and the federal government's Occupational Safety and Health Administration (OSHA) regulations were open and clear. When he tried to serve a written citation of unsafe practices upon ACESCO, he was told by the owner in front of the ACESCO employees in vulgar and no uncertain terms what he could do with his piece of paper. Mr. Harrell reported the unsafe practices of ACESCO to his superiors but never told the architects about any safety problems with ACESCO. When he made up a report on the accident which gave rise to the instant lawsuit, he was told by his supervisor in The Law Company to tear it up.

The plaintiffs presented expert testimony through one Jacob Alan Dickinson, a Topeka architect. Mr. Dickinson said that he had not actually practiced architecture for some nine or ten years before the case was tried and that he had only once worked on a shopping center project comparable to Dillard's. He testified he was familiar with the contract documents in this case and that it was the duty of the architect to see that the owner gets what he pays for; that is, that the finished product conforms to the plans and specifications. Further, he stated that he would not have rejected ACESCO as a subcontractor but he would have been there early in the construction process to let them know what was going to be required of them and that they would have to comply with the plans and specifications. It is the architect's responsibility to see that the construction is done properly and the architect should not rely upon the general contractor for that determination. It is up to the contractor to determine how the work will be done and the architect's role is to tell the contractor

what to do and not how to do it. The architect has a duty to the public to insure that the building is designed and built according to Code. He considered workmen on the project to be part of the public. As to safety conditions existing on the jobsite, it is the architect's duty to see that there was a safety program and if the architect observed something dangerous from a safety standpoint he should call it to the attention of the general contractor. In his opinion, in order for an architect to fulfill his professional responsibility for a sound ultimate product, he must assure himself of the quality of the work in progress. Mr. Dickinson testified that he checked 10 or 12 of the joist welds on the completed store and found them to be insufficient and not in compliance with the specifications drawn by the architects. He indicated there would be several hundred such welds in the entire project. The inference attempted to be drawn from his testimony was that such inadequate welds or noncompliance with the specifications is indicative of a builder who does sloppy work and if he does sloppy work he probably fails to comply with safety precautions, although there was no showing that the defective welds had anything to do with the cause of the accident in question and no testimony by Mr. Dickinson that jobsite safety was the responsibility of the architect.

Dickinson further testified that an architect should not interfere with the contractor's means and methods unless those methods jeopardized the integrity of the final product or the safety of the people on the job.

Both plaintiffs testified they knew the ACESCO raising gang was not always as careful as it should be. Hanna said he sometimes checked the jobs done by the raising gang to see if they were done properly, but that this particular time he did not check. He was of the opinion that if the joist which fell had been properly bolted or tack welded by the raising gang the accident would not have occurred. Neither man could see if the joist was tacked or bolted on one end or the other from their relative positions just prior to the accident. Both were experienced steel construction workers.

The defendant's expert was Roy Calvin, a Wichita architect. He testified that in his view of contract administration, as contemplated by the industry document A201, the architect generally has no responsibility for safety practices. He said the archi-

tect ordinarily is only concerned with the project results and the integrity of the finished product. The architect's duty is to see that the building is constructed in accordance with the plans and specifications and that the final product that the owner gets is what he agreed to purchase.

Huer, Johns raises several issues on appeal, including failure of the trial court to grant its motions for summary judgment, directed verdict and other post-trial motions. It is also contended the evidence was insufficient, the verdict is contrary to the evidence and the trial court committed error in its instructions. The principal and controlling issues are the architect's duty to the workmen and the alleged error of the trial court in its instruction number nine relating to the contractual duty of the defendant.

In instruction number nine, the court said:

"Under the terms of the contracts, the architect had the duty to make professional observations and inquiries regarding the safety practices on the project, and to inform the general contractor of significant safety violations on the job. The architects had the further duty to report to the owner in the event that the general contractor did not take reasonable measures to correct the conditions complained of."

Did the contract between Huer, Johns and Dillard's create a duty on the architect to be responsible for safety practices on the jobsite? We think not. Absent any showing that the architect affirmatively or by its actions assumed such a duty, we find none in the employment contract. The architect's contractual duties were to get the building constructed as soon as possible in accordance with the plans and specifications and the contract, designated A201, between the contractor and the owner. Some of the relevant portions of the written contract provide:

"1.1.3 The term Work includes all labor necessary to produce the construction required by the Contract Documents, and all materials and equipment incorporated or to be incorporated in such construction.

. . . .

"2.1.2 Nothing contained in the Contract Documents shall create any contractual relationship between the Architect and the Contractor.

. . . .

"2.2.1 The Architect will provide general Administration of the Construction Contract, including performance of the functions hereinafter described.

"2.2.2 The Architect will be the Owner's representative during construction and until final payment. The Architect will have authority to act on behalf of the Owner to the extent provided in the Contract Documents, unless otherwise

modified by written instrument which will be shown to the Contractor. The Architect will advise and consult with the Owner, and all of the Owner's instructions to the Contractor shall be issued through the Architect.

. . . .

"2.2.4 *The Architect will make periodic visits to the site to familiarize himself generally with the progress and quality of the Work* and to determine in general if the Work is proceeding in accordance with the Contract Documents. On the basis of his on-site observations as an architect, he will keep the Owner informed of the progress of the Work, and will endeavor to guard the Owner against defects and deficiencies in the Work of the Contractor. *The Architect will not be required to make exhaustive or continuous on-site inspections to check the quality or quantity of the Work. The Architect will not be responsible for construction means, methods, techniques, sequences or procedures or for safety precautions and programs in connection with the Work,* and he will not be responsible for the Contractor's failure to carry out the work in accordance with the Contract Documents.

. . . .

"2.2.12 The Architect will have authority to reject Work which does not conform to the Contract Documents. Whenever, in his reasonable opinion, he considers it necessary or advisable to insure the proper implementation of the intent of the Contract Documents, he will have authority to require special inspection or testing of the Work in accordance with Subparagraph 7.8.2 whether or not such Work be then fabricated, installed or completed. However, *neither the Architect's authority to act under this Subparagraph 2.2.12, nor any decision made by him in good faith either to exercise or not to exercise such authority, shall give rise to any duty or responsibility of the Architect to the Contractor, any Subcontractor, any of their agents or employees,* or any other person performing any of the Work.

. . . .

"3.3.1 If the Contractor fails to correct defective Work or persistently fails to supply materials or equipment in accordance with the Contract Documents, *the Owner may order the Contractor to stop the Work or any portion thereof,* until the cause for such order has been eliminated.

. . . .

"4.3.1 *The Contractor shall supervise and direct the Work,* using his best skill and attention. *He shall be solely responsible for all construction means, methods, techniques, sequences and procedures* and for coordinating all portions of the Work under the Contract." (Emphasis added.)

In addition to the foregoing provisions, A201 contains one entire article dealing with the "Protection of Persons and Property." The pertinent sections under Article 10 provide:

"10.1.1 *The Contractor shall be responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the Work.*"
"10.2.1 *The Contractor shall take all reasonable precautions for the safety of, and shall provide all reasonable protection to prevent damage, injury or loss to:*
   .1 *all employees on the Work* and all other persons who may be affected thereby;

.2 all the Work and all materials and equipment to be incorporated therein, whether in storage on or off the site, under the care, custody or control of the Contractor or any of his Subcontractors or Sub-subcontractors; and

.3 other property at the site or adjacent thereto, including trees, shrubs, lawns, walks, pavements, roadways, structures and utilities not designated for removal, relocation or replacement in the course of construction.

"10.2.2 *The Contractor shall comply with all applicable laws, ordinances, rules, regulations and lawful orders of any public authority having jurisdiction for the safety of persons or property* and to protect them from damage, injury or loss. *He shall erect and maintain,* as required by existing conditions and progress of the Work, *all reasonable safeguards for safety and protection,* including posting danger signs and other warnings against hazards, promulgating safety regulations and notifying owners and users of adjacent utilities.

. . . .

"10.2.5 *The Contractor shall designate a responsible member of his organization at the site whose duty shall be the prevention of accidents.* This person shall be the Contractor's superintendent unless otherwise designated in writing by the Contractor to the Owner and the Architect." (Emphasis added.)

Thus, it is clear from the written contract that the duty to provide and enforce safe working conditions was that of the general contractor, The Law Company. In addition, the employer of the plaintiffs, ACESCO, would have a duty to provide safe working conditions for its employees.

In finding a contractual duty on Huer, Johns the trial court construed the term "Work" in § 1.1.3 of the written contract to include safety precautions and based that decision partially upon the provision in § 2.2.1 that the architect is to provide general administration of the construction contract. The trial court stated:

"It seems, in relation to the contract documents themselves, the primary question would be whether the architects had any authority over safety precautions which are used by the contractors, therefore, whether any duty arises on the part of the architects. It's the holding of the Court that the architects do have some authority in regard to safety precautions used by the contractor. The Court has examined the contract portion entitled A201; it looks to the definition of "work" which includes all labor necessary to produce the construction required by the contract documents and the Court rules that the safety procedures used by the contractor comes under the definition of "work" contained in 1.1.3 of A201."

Such a construction is obviously contrary to the clear wording of the contract itself and, if correct, would require that the ultimate responsibility for compliance with all of the provisions of the contract between the contractor and the owner rests upon the architect. We do not construe the contract so broadly as to the term "Work" as used in the contract and as applied to the architect's duties.

There have been numerous decisions in recent years wherein the same or similar contractual provisions have been before the courts based upon claims by injured workmen against the architect or engineer responsible for the design of the structure. The proliferation of such suits may conceivably be based upon the desire of the injured workman to find a "deep pocket" to more adequately compensate for serious injury than may be recovered from the employer or general contractor under the limitations of workers' compensation statutes. *Kreiger v. J. E. Greiner Co.,* 282 Md. 50, 382 A.2d 1069 (1978).

The question of the extent of the contractual responsibility of the design professional, in this case Huer, Johns, for safety precautions on the jobsite and the liability of such persons for injuries to workmen on the jobsite is one of first impression in Kansas.

In *Wheeler & Lewis v. Slifer,* 195 Colo. 291, 577 P.2d 1092 (1978), a welder-carpenter who was an employee of a subcontractor on a high school construction project brought suit against the architects for injuries received when a portion of the roof collapsed allegedly due to lack of shoring and bracing. The Colorado Supreme Court, in construing a construction contract with similar provisions to the one now before us, stated:

"The Architects' liability in this case was premised upon the breach of a contractual duty owed by the Architects to the workmen engaged at the construction site. Slifer contended, and the court of appeals held, that the contract between the Architects and the District and the contract between the District and the general contractor imposed the duty upon the Architects 'to see that reasonable precautions were taken in protecting the workmen on the site from unsafe conditions.' We disagree.

[1] A split of authority exists among the jurisdictions which have considered whether an architect, contractually responsible for supervision of a construction project, is liable for injuries sustained by workmen as a result of unsafe working conditions. *See* Annot., 59 A.L.R.3d 869 (1974); AIA, *Legal Citator of Building and Construction Contracts;* AIA, *Architects Handbook of Professional Practice;* K. Davidson, *The Liability of Architects,* 13 TRIAL 20 (June 1977). Several courts have held that architects have extensive supervisory duties and have imposed liability. *Swarthout v. Beard,* 33 Mich. App. 395, 190 N.W.2d 373 (1971), *rev'd on other grounds,* 388 Mich. 637, 202 N.W.2d 300 (1972); *Miller v. DeWitt,* 37 Ill. 2d 273, 226 N.E.2d 630 (1967). We, however, believe the better rule is found in those jurisdictions which have refused to impose liability absent a clear assumption of duty. *Krieger v. J. E. Greiner Co., Inc.,* 282 Md. 50, 382 A.2d 1069; *Walters v. Kellam & Foley,* [172] Ind. App. [207], 360 N.E.2d 199 (1977); *Brown v. Gamble Construction Co., Inc.,* 537 S.W.2d 685 (Mo. App. 1976); *Vonasek v. Hirsch and Stevens, Inc.,* 65 Wis. 2d 1, 221 N.W.2d 815 (1974); *Seeney*

*v. Dover Country Club Apartments, Inc.*, ____ Del. ____, 318 A.2d 619 (1974); *Jackson v. Sergent, Hauskins & Beckwith Engineers, Inc.*, 20 Ariz. App. 330, 512 P.2d 862 (1973); *Reber v. Chandler High School District #202*, 13 Ariz. App. 133, 474 P.2d 852 (1970); *Walker v. Wittenberg, Delony & Davidson, Inc.*, 241 Ark. 525, 412 S.W.2d 621 (1966), *reh granted*, 242 Ark. 97, 412 S.W.2d 621, 626 (1967); *Day v. National United States Radiator Corp.*, 241 La. 288, 128 So. 2d 660 (1961)." p. 293.

After stating the relevant contractual provisions, the court went on to state:

"We conclude, as a matter of law, however, that the terms of both contracts are unambiguous and insufficient to support a conclusion that the parties intended the Architects have the duty of supervising the method and manner of construction to insure that the work be performed safely. The provisions, when considered in the context of the entire contract, merely evidence an intention that the Architects exercise such supervision as is necessary to assure that the work comply with the plans and specifications prepared by the Architects." p. 295.

"The contractual provisions in this case, considered in the context of the entire contract, do not support a conclusion that the Architects had the duty to supervise the methods and details of construction to ensure the safety of the workmen on the site. The duty of supervision in this case is more consonant with the intention that the Architects exercise such supervision as is necessary to ensure that the contractor's work complies with the plans and specifications prepared by the Architects. Before an architect will be held to have agreed to exercise direct control over a contractor with respect to day-to-day safety precautions, the duty must clearly appear in the contract." p. 297.

In an older New York case where the architects had contracted to "supervise" the work on the project, the Appellate Division rendered judgment for the architects. The plaintiff architects had sued for their fee. The trial court failed to sustain their demurrer to a counterclaim which alleged that the architects were responsible for injury caused by unsafe jobsite practices and violations of a safety law. The court said:

"The section of the Labor Law which plaintiffs [the architects] are charged with permitting the contractors to violate had nothing to do with the construction of the building which could be well constructed, and could as perfectly follow the plans and specifications without barriers around the shafts and openings as with them. The sole object of the section was to protect the workmen employed upon the building from bodily injury. [Citation omitted.] The very utmost obligation assumed by the plaintiffs under their alleged special contract of supervision was to see that the building was properly constructed, and if that result was achieved they were not called upon to watch and inspect every means adopted by the contractors in fulfilling their contract." *Clinton v. Boehm*, 139 App. Div. 73, 75, 124 N.Y.S. 789 (1910).

The New York court was of the opinion that the architect was not

generally to be held responsible for those safety factors solely related to worker safety.

In *Brown v. Gamble Const. Co., Inc.*, 537 S.W.2d 685 (Mo. App. 1976), the court was faced with the identical contract now before this court. Brown, a construction worker employed by the roofing subcontractor was fatally injured while working on a roof when he fell through a hole in the roof. His widow brought suit against the general contractor and several others including the project architects. The Missouri court upheld a directed verdict in favor of the defendant architect. The court stated:

"What plaintiff does contend in essence is that the architects have a duty as 'design professionals' to supervise the construction and insure that safety precautions are taken to protect workers. But architects are under no duty to supervise construction unless they expressly agree to do so. *Aetna Insurance Co. v. Hellmuth, Obata & Kassabaum, Inc.*, 392 F.2d 472, 476 [3-5] (8th Cir. 1968); *Westerhold v. Carroll*, 419 S.W.2d 73, 80-81 (Mo. 1967); *Miller v. DeWitt*, 59 Ill. App. 2d 38, 208 N.E.2d 249, 284-85 [23] (1965), affirmed in relevant part, 37 Ill. 2d 273, 226 N.E.2d 630 (1967). A determination in this case as to who was responsible for general supervision of the project and, specifically, for establishing safety measures to protect persons and property involved is not difficult. By contract, Gamble expressly assumed responsibility for safety precautions during the construction of the store. Article 10 of the contract, 'Protection of Persons and Property', states that 'The Contractor shall be responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the Work.' Article 2.2.4 provided: 'The Architect will not be responsible for construction means, methods, techniques, sequences of procedures, or for safety precautions and programs in connection with the Work,* *.' . . . Gamble's responsibility for project supervision and safety precautions appears quite clear. The architect was relieved of any such duty." p. 687.

*Baker v. Pidgeon Thomas Company*, 422 F.2d 744 (6th Cir. 1970), involved a factual situation quite similar to ours. Baker was working on a construction project when a steel joist fell from a twenty-four foot high steel column and struck his back. After receiving workmen's compensation from his employer's insurer, Baker filed suit against several others on the job including the design engineers. The court in upholding a directed verdict for the engineers stated:

"Allen & Hoshall contracted with the owner, Boise Cascade, to design a building and 'to act in a general supervisory capacity throughout the construction period.' This contract provided for periodic inspections on the job site by Allen & Hoshall, but it did not require the firm to maintain a constant day-to-day superintendence over the general contractor and the subcontractors.

"It is clear from this contract that Allen & Hoshall's primary obligation was to

design the building and to supervise its construction to insure that design and material specifications would be followed. There was no requirement that Allen & Hoshall make safety inspections. Nor were they given authority to stop work for safety reasons as they could when they detected deviations from specifications.

"Appellant argues that Allen & Hoshall's supervisory duties required it to determine whether the steel erector, Pidgeon Thomas, was complying with the AISC Code as required by its contract with Boise Cascade. He contends that the joist would not have fallen from the steel column if Pidgeon Thomas had followed the Code, and had bolted or welded it instead of permitting it to be held in place on the column solely by its own weight. However, there is nothing in Allen & Hoshall's contract with the owner that imposed a duty to ascertain whether all the subcontractors were conforming to their contracts with the owner, except to the extent those contracts required conformity with design specifications. Accordingly, we hold that the District Court did not err in granting a directed verdict for Allen & Hoshall." p. 746.

In *Miller v. DeWitt,* 37 Ill. 2d 273, 226 N.E.2d 630 (1967), plaintiffs, employees of a contractor, were injured when the roof of a school gymnasium they were working on collapsed, and brought suit against several parties including the architects. Although the court found that the architects could be held liable on the theory of negligence, in considering the contractual liability of the architects arising from their supervisory duties the court stated the general rule to be:

"[T]he general duty to 'supervise the work' merely creates a duty to see that the building when constructed meets the plans and specifications contracted for." 37 Ill. 2d at 284.

Thus, it appears that the great weight of authority supports the rule that an architect does not by reason of his supervisory authority over construction assume responsibility for the day-to-day methods utilized by the contractor to complete the construction. The architect's basic duty is to see that his employer gets a finished product which is structurally sound and which conforms to the plans and specifications. Instruction nine as given by the court directed the jury that Huer, Johns was responsible by contract for safety practices on the project, and was clearly erroneous. Any duty Huer, Johns may have had involving safety procedures of the contractor and subcontractors must have been specifically assumed by contract or must have arisen by actions outside the contract. The contract of Huer, Johns with Dillard's does not include responsibility for jobsite safety procedures.

In determining whether an architect's contractual duty to supervise the construction includes the responsibility for safety on the jobsite, it has been recognized that the architect may intentionally, or impliedly by his actions, bring the responsibility for safety within his duty of supervision. In Illinois, by statute, the person "in charge" of the construction is liable under the Illinois Structural Work Act for injury resulting from safety violations of the act. In *Hausam v. Victor Gruen & Associates*, 86 Ill. App. 3d 1145, 408 N.E.2d 1051 (1980), the court set forth certain factors to be considered in determining whether a person was in charge of the construction. The court stated:

"The test of whether a party is in charge of the work involves an assessment of the totality of the circumstances in each case. (*Norton.*) [*Norton v. Wilbur Waggoner Equipment Rental & Excavating Co.*, 76 Ill. 2d 481, 394 N.E.2d 403 (1979).] In the recent case of *Westerfield v. Arjack Co.* (1979), 78 Ill. App. 3d 137, 397 N.E.2d 451, the court identified a number of factors which should be considered in determining whether the totality of the circumstances establishes that a party had charge of the work: (1) actual supervision and control of the work; (2) retention of the *right* to supervise and control; (3) constant participation in ongoing activities at the construction site; (4) supervision and coordination of subcontractors; (5) responsibility for taking safety precautions at the job site; (6) authority to issue change orders; (7) the right to stop the work." p. 1147. (Emphasis in original.)

Such factors, while not exclusive, would appear to be relevant in any case where an attempt is made to expand the architect's liability beyond the specific provisions of the employment contract.

In *Schmeck v. City of Shawnee*, 232 Kan. 11, 651 P.2d 585 (1982), a power company had accepted the responsibility for designing an intersection traffic control system for the city. Since the designing of the traffic control system was not completed by the power company, this court sustained a plaintiff's verdict against the power company when the plaintiff proved that she was injured as a result of the power company's failure to complete the job it started or undertook to complete. In *Schmeck*, at 24, we adopted the following from the Restatement:

"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

(a) his failure to exercise reasonable care increases the risk of such harm, or

(b) he has undertaken to perform a duty owed by the other to the third person, or

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking." Restatement (Second) of Torts § 324A (1965).

Considering the various factors set forth in *Hausam* and our recent decision in *Schmeck,* it would not appear from the facts in this case that Huer, Johns by its action assumed any expanded contractual duties. On the contrary, the defendant has specifically disclaimed any responsibility for safety conditions on the Dillard's jobsite and, as alleged by plaintiffs, did nothing relative to safety on the jobsite.

Cases which have found liability on the part of the design professional have usually turned upon specific facts creating a duty to the jobsite workmen. *Associated Engineers, Inc. v. Job,* 370 F.2d 633 (8th Cir. 1966), detailed supervisory duties, including safety, in the contract; *Caldwell v. Bechtel, Inc.,* 631 F.2d 989 (D.C. Cir. 1980), defendant was a safety engineering firm with actual knowledge of the danger; *Cutlip v. Lucky Stores,* 22 Md. App. 673, 325 A.2d 432 (1974), structural collapse; *Erhart v. Hummonds,* 232 Ark. 133, 334 S.W.2d 869 (1960), additional fee for detailed supervision; *Evans v. Howard R. Green Co.,* 231 N.W.2d 907 (Iowa 1975), design defect occurring during construction; *Estate of Clark,* 33 Mich. App. 395, 190 N.W.2d 373 (1971), 59 A.L.R.3d 858, *rev'd on other grounds* 388 Mich. 637, 202 N.W.2d 300 (1972), actual knowledge. For additional authorities see Annot., 59 A.L.R.3d 869; Comment, *The Supervising Architect: His Liabilities and His Remedies When a Worker is Injured,* 64 Nw. U.L. Rev. 535 (1969); Sweet, *Site Architects and Construction Workers: Brothers and Keepers or Strangers?,* 28 Emory L.J. 291 (1979); Lurie and Stein, *Injured Workmen: Loss Allocation Among the Direct Participants in the Construction Process,* 23 St. Louis U.L.J. 292 (1979); Mills, *The Design Professional - An Unlikely Defendant Under the Illinois Structural Work Act,* 23 St. Louis U.L.J. 317 (1979); and Philo, *Revoke the Legal License to Kill Construction Workers,* 19 DePaul L. Rev. 1 (1969).

In the instant case, we hold that Huer, Johns did not have a contractual duty to provide for the safety of the plaintiffs and the court's instruction was clearly error. There is nothing in the record which would support a finding that Huer, Johns by its

actions undertook or could have impliedly assumed responsibility for safety procedures on the jobsite.

We agree with plaintiffs' contentions that if Huer, Johns had actual knowledge of unsafe practices they should have taken some action. However, all the evidence discloses that they were not advised of any such practices. Plaintiffs, as well as other employees of ACESCO, and the supervisory personnel of The Law Company were fully aware of the work practices of ACESCO yet no one advised Huer, Johns of these problems. It is safe to assume that it was generally accepted that Huer, Johns was not responsible for safety on the jobsite. As specifically spelled out in the contract, that duty was upon the general contractor.

It is a fundamental rule that actionable negligence must be based on a breach of duty.

"For negligence to exist there must be a duty and a breach thereof before the conduct becomes actionable. If no duty exists there can be no negligence." *Madison v. Key Work Clothes,* 182 Kan. 186, 192, 318 P.2d 991 (1957).

In *Blackmore v. Auer,* 187 Kan. 434, 357 P.2d 765 (1960), we affirmed the trial court's action in sustaining a demurrer to the plaintiff's evidence when no duty was found. A demurrer to the evidence was essentially the same as a motion for directed verdict under our present code of civil procedure. In *Blackmore* we said:

"Negligence is not actionable unless it involves the invasion of a legally protected interest, the violation of a right. In every instance, before an act is said to be negligent, there must exist a duty to the individual complaining, the observance of which would have averted or avoided the injury. The plaintiff who sues his fellow man sues for a breach of duty owing to himself." p. 440.

The general rule as to an architect's responsibility for negligence has been stated as follows:

"An architect may be held liable for negligence in failing to exercise the ordinary skill of his profession, which results in the erection of an unsafe structure whereby any one lawfully on the premises is injured. An architect's liability for negligence resulting in personal injury or death may be based upon his supervisory activities or upon defects in the plans. The liability of the architect, moreover, is not limited to the owner who employed him; the modern view is that privity of contract is not a prerequisite to liability. As in other negligence cases, however, there can be no recovery against the architect unless it can be established that his negligence was the proximate cause of the personal injury or wrongful death sued for." 5 Am. Jur. 2d, Architects § 25, pp. 688-89.

As a professional, an architect cannot stand idly by with actual knowledge of unsafe safety practices on the jobsite and take no

steps to advise or warn the owner or contractor. Even in such a situation, however, the plaintiffs still bear the burden of showing the duty owed to them, a breach of that duty and that the breach was the proximate cause of the injuries suffered. Huer, Johns was hired by Dillard's to design a building and to see that the finished product conformed to the plans and specifications. The employment contract between Huer, Johns and Dillard's did not include responsibility for safety procedures on the jobsite and they did not assume such responsibilities outside the duties imposed by the contract. To the contrary, the contract specifically provided that the general contractor would assume such duties. Huer, Johns was not responsible for the injuries suffered by the plaintiffs.

The judgment is reversed and the case remanded with directions to enter judgment for the defendants.